WASHINGTON METROPOLITAN AREA TRANSIT
AUTHORITY *v.* JOHNSON ET AL.

No. 83–747.   Argued April 24, 1984—Decided June 26, 1984

*E. Barrett Prettyman, Jr.*, argued the cause for petitioner. With him on the briefs were *Vincent H. Cohen, Walter A. Smith, Jr., Robert B. Cave, Susan M. Hoffman,* and *Arthur Larson.*

*William F. Mulroney* argued the cause for respondents. With him on the brief were *Peter J. Vangsnes* and *James M. Hanny.**

*Briefs of *amici curiae* urging reversal were filed for the Alliance of American Insurers by *Thomas D. Wilcox;* for the Commonwealth of Virginia et al. by *Gerald L. Baliles,* Attorney General of Virginia, and *Stephen*

JUSTICE MARSHALL delivered the opinion of the Court.

Section 4(a) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. (part 2) 1426, 33 U. S. C. § 904(a), makes general contractors responsible for obtaining workers' compensation coverage for the employees of subcontractors under certain circumstances. The question presented by this case is when, if ever, these general contractors are entitled to the immunity from tort liability provided in § 5(a) of the Act, 33 U. S. C. § 905(a).

I

Petitioner Washington Metropolitan Area Transit Authority (WMATA) is a government agency created in 1966 by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia with the consent of the United States Congress.[1] WMATA is charged with the construction and operation of a rapid transit system (Metro) for the District of Columbia and the surrounding metropolitan region. Under the interstate compact that governs its existence, WMATA is authorized to hire subcontractors to work on various aspects of the Metro construction project.[2] Since 1966 WMATA has engaged several hundred subcontractors, who in turn have employed more than a thousand sub-subcontractors.[3]

Of the multifarious problems WMATA faced in constructing the Metro system, one has been ensuring that workers engaged in the project in the District of Columbia are cov-

---

H. Sachs, Attorney General of Maryland; and for the National Association of Minority Contractors by Frederick B. Abramson.

Laurence T. Scott, J. Joseph Barse, and Pamela Bresnahan filed a brief for Machean-Grove-Skanska Joint Venture et al. as amici curiae urging affirmance.

[1] See Washington Metropolitan Area Transit Authority Interstate Compact, Pub. L. 89–774, 80 Stat. 1324; D. C. Code § 1–2431 (1981); 1965 Md. Laws, ch. 869; 1966 Va. Acts, ch. 2.

[2] See 80 Stat. 1329.

[3] For the remainder of this opinion, the term "subcontractor" will be used to include both subcontractors and sub-subcontractors.

ered by workers' compensation insurance. Under § 4(a) of the LHWCA,[4] general contractors "shall be liable for and shall secure the payment of [workers'] compensation to employees of the subcontractor unless the subcontractor has secured such payment." 33 U. S. C. § 904(a). A company "secures" compensation either by purchasing an insurance policy or by obtaining permission from the Secretary of Labor to self-insure and make compensation payments directly to injured workers. 33 U. S. C. § 932(a). The effect of § 4(a) is to require general contractors like WMATA[5] to obtain workers' compensation coverage for the employees of subcontractors that have not secured their own compensation. See *infra*, at 938.

During the initial phase of Metro construction, which ran from 1969 to 1971, WMATA relied upon its subcontractors to purchase workers' compensation insurance for subcontractor employees. However, when the second phase of construction began, WMATA abandoned this policy in favor of a more centralized insurance program. As a financial matter, WMATA discovered that it could reduce the cost of workers' compensation insurance if it, rather than its numerous subcontractors, arranged for insurance. Practical considerations

---

[4] District of Columbia Code § 36–501 (1973) incorporates the LHWCA, 33 U. S. C. § 901 *et seq.*, to cover employees "carrying on any employment in the District of Columbia." In the other two jurisdictions in which WMATA operates, state statutes place general contractors under similar duties to ensure that subcontractor employees are covered by worker's compensation insurance. See Md. Ann. Code, Art. 101 *et seq.* (1979 and Supp. 1983); Va. Code § 65.1–30 *et seq.* (1980).

[5] Despite contrary findings by the District Courts and Court of Appeals, respondents persist in arguing that WMATA is not a general contractor for purposes of the LHWCA. Whether WMATA serves as the general contractor for the entire Metro construction project turns on a factual inquiry into WMATA's responsibility for supervising project construction. Because the lower courts' findings have ample support in the record, see, *e. g.*, App. 163–184, 276–280, we accept their conclusion that WMATA is a general contractor for purposes of § 4(a) of the LHWCA. See *Rogers* v. *Lodge*, 458 U. S. 613 (1982).

also influenced WMATA's decision to change its workers' compensation program. Requiring subcontractors to purchase their own insurance apparently hampered WMATA's affirmative action program, because many minority subcontractors were unable to afford or lacked sufficient business experience to qualify for their own workers' compensation insurance policies.[6] Moreover, as the number of Metro subcontractors grew, it became increasingly burdensome for WMATA to monitor insurance coverage at every tier of the Metro hierarchy. Periodically, subcontractors' insurance would expire or their insurance companies would go out of business without WMATA's being informed. In such cases, a group of employees went uninsured, and WMATA technically breached its statutory duty to ensure that these employees were covered by compensation plans.

For all of these reasons, WMATA elected to assume responsibility for securing workers' compensation insurance for all Metro construction employees. Effective July 31, 1971, WMATA purchased a comprehensive "wrap-up" policy from the Lumberman's Mutual Casualty Co. Under the policy, WMATA paid a single premium and, in return, Lumberman's Mutual agreed to make compensation payments for any injuries suffered by workers employed at Metro construction sites and compensable under the relevant workers' compensation regimes.[7] After arranging for this "wrap-up" coverage, WMATA informed potential subcontractors that WMATA would "for the benefit of contractors and others, procure and pay premiums" for workers' compensation insurance and that the cost of securing such compensation in-

---

[6] As a result of its federal funding, WMATA is charged with ensuring that minority business enterprises have a full opportunity to participate in the Metro construction project. See Urban Mass Transportation Act of 1964, § 12, 49 U. S. C. § 1608(f); 49 CFR § 23.1 *et seq.* (1983).

[7] WMATA's own employees were not covered by the Lumberman's Mutual policy. For these employees, WMATA has qualified as a self-insurer under § 32(a)(1) of the LHWCA, 33 U. S. C. § 932(a)(1).

surance need no longer be included in bids submitted for Metro construction jobs. App. 104, 106. Subcontractors, however, were also advised that, if they deemed it necessary, they could "at their own expense and effort" obtain their own workers' compensation insurance. *Id.*, at 104. Once subcontractors were awarded Metro contracts, Lumberman's Mutual issued certificates of insurance confirming that the subcontractor's employees were covered by WMATA's policy. On these certificates, both WMATA and the subcontractor were listed as parties to whom the insurance was issued. *Id.*, at 225.

Respondents are employees of subcontractors engaged in the Metro project. Each respondent filed a compensation claim for work-related injuries. Most of these claims alleged respiratory injuries caused by high levels of silica dust and other industrial pollutants at Metro sites. None of respondents' employers had secured its own workers' compensation insurance, and respondents' claims were therefore handled under the Lumberman's Mutual policy purchased by WMATA. Lumberman's Mutual paid five of the respondents lump-sum compensation awards in complete settlement of their claims. The remaining two respondents received partial awards from Lumberman's Mutual.

The instant litigation arose when respondents attempted to supplement their workers' compensation awards by bringing tort actions against WMATA. These suits, which were filed before five different judges in the United States District Court for the District of Columbia, involved the same work-related incidents that had given rise to respondents' LHWCA claims. In each of the actions, WMATA moved for summary judgment on the ground that it was immune from tort liability for such claims under § 5(a) of the LHWCA, 33 U. S. C. § 905(a). In all of the District Court cases, WMATA's motions for summary judgment were granted, each judge agreeing that, by purchasing workers' compensation insurance for the employees of its subcontractors, WMATA had earned

§ 5(a)'s immunity from tort suits brought for work-related injuries.

In a consolidated appeal, the United States Court of Appeals for the District of Columbia Circuit reversed. *Johnson v. Bechtel Associates Professional Corp.*, 230 U. S. App. D. C. 297, 717 F. 2d 574 (1983). The Court of Appeals reasoned that § 5(a) of the LHWCA grants general contractors immunity from tort actions by subcontractor employees only if the general contractor has secured compensation insurance in satisfaction of a statutory duty. According to the Court of Appeals, WMATA had not acted under such a duty in this case. Had respondents' employers actually refused to secure the worker's compensation insurance, then WMATA as general contractor would have had what the Court of Appeals considered a statutory duty to secure insurance for respondents. However, WMATA never gave respondents' employers the opportunity to default on their statutory obligations to secure compensation; WMATA pre-empted its subcontractors through its unilateral decision to purchase a "wrap-up" policy covering all subcontractor employees. The Court of Appeals concluded that, by pre-empting its subcontractors, WMATA acted voluntarily, and was therefore not entitled to § 5(a)'s immunity. We granted WMATA's petition for a writ of certiorari, 464 U. S. 1068 (1984), and we now reverse.

## II

Workers' compensation statutes, such as the LHWCA, "provide for compensation, in the stead of liability, for a class of employees." S. Rep. No. 973, 69th Cong., 1st Sess., 16 (1926). These statutes reflect a legislated compromise between the interests of employees and the concerns of employers. On both sides, there is a *quid pro quo*. In return for the guarantee of compensation, the employees surrender common-law remedies against their employers for work-related injuries. For the employer, the reward for securing compensation is immunity from employee tort suits. See

*Morrison-Knudsen Construction Co.* v. *Director, OWCP,*
461 U. S. 624, 636 (1983); *Potomac Electric Power Co.* v.
*Director, OWCP,* 449 U. S. 268, 282, and n. 24 (1980);
see also 2A A. Larson, Law of Workmen's Compensation
§ 72.31(c) (1982).

In the case of the LHWCA, § 4(a)(b) and § 5(a) codify the
compromise at the heart of workers' compensation.   The
relevant portions of these provisions read as follows:

> "SEC. 4. (a) Every employer shall be liable for and
> shall secure the payment to his employees of the com-
> pensation payable under sections 7, 8, 9.   In the case of
> an employer who is a subcontractor, the contractor shall
> be liable for and shall secure the payment of such com-
> pensation to employees of the subcontractor unless the
> subcontractor has secured such payment.

> "(b) Compensation shall be payable irrespective of
> fault as a cause for the injury."   44 Stat. (part 2) 1426,
> 33 U. S. C. §§ 904(a), (b).

> "SEC. 5. (a) The liability of an employer prescribed in
> section 4 shall be exclusive and in place of all other liabil-
> ity of such employer to the employee . . . , except that if
> an employer fails to secure payment of compensation as
> required by this Act, an injured employee . . . may elect
> to claim compensation under this Act, or to maintain an
> action at law or in admiralty for damages . . . ."   86
> Stat. 1263, 33 U. S. C. § 905(a).

The current case stems from an ambiguity in the wording
of these sections.   It is unclear how § 5(a)'s grant of im-
munity applies to the contractors mentioned in § 4(a).   This
interpretative question divides into two distinct inquiries.
First, does § 5(a)'s grant of immunity ever extend to general
contractors?   And second, if § 5(a) can extend to general con-
tractors, what must a contractor do to qualify for § 5(a)'s
immunity?   We will consider these questions in turn.

## A

The language of § 5(a)'s grant of immunity does not effort-lessly embrace contractors. Section 5(a) speaks in terms of "an employer" and, at least as far as the employees of subcontractors are concerned, a general contractor does not act as an employer.

A few courts have accepted a literal reading of the language of § 5(a) and analogous state immunity provisions. For instance, in *Fiore* v. *Royal Painting Co.*, 398 So. 2d 863, 865 (1981), a Florida appellate court concluded: "Only the actual employer . . . may get under the immunity umbrella of [33 U. S. C.] § 905." Similarly, in interpreting an almost identical provision of New York workers' compensation law,[8] the New York Court of Appeals has reasoned that tort immunity should not apply to contractors because "'[t]he word "employee" denotes a contractual relationship'" and a contractor never is contractually bound to the employees of a subcontractor. *Sweezey* v. *Arc Electrical Construction Co.*, 295 N. Y. 306, 310–311, 67 N. E. 2d 369, 370–371 (1946) (quoting *Passarelli Columbia Engineering and Contracting Co.*, 270 N. Y. 68, 75, 200 N. E. 583, 585 (1936)).

The more widely held view, however, is that the term "employer" as used in § 5(a) has a statutory definition somewhat broader than that word's ordinary meaning. The majority of courts considering the issue, including the Court of Appeals in this case, have concluded that § 5(a)'s tort immunity can extend to general contractors, at least when the contractor has fulfilled its responsibilities to secure compensation for subcontractor employees in accordance with the requirements of § 4(a). See, *e. g.*, *Johnson* v. *Bechtel Associates Professional Corp.*, *supra*, at 302, 717 F. 2d, at 581; *Thomas* v. *George Hyman Construction Co.*, 173 F. Supp. 381, 383

---

[8] 1922 N. Y. Laws, ch. 615, § 56; see H. R. Rep. No. 1190, 69th Cong., 1st Sess., 2 (1926) ("The [LHWCA] follows in the main the New York State compensation law . . .").

(DC 1959); *DiNicola* v. *George Hyman Construction Co.*, 407 A. 2d 670, 674 (D. C. 1979).[9]

In choosing between these conflicting interpretations of § 5(a), we are predisposed in favor of the majority view that tort immunity should extend to contractors. This position is presumptively the better view because it is more consistent with the compromise underlying the LHWCA. The reward for securing compensation and assuming strict liability for worker-related injuries has traditionally been immunity from tort liability. See *supra*, at 931–932. "Since the general contractor is [by the operation of provisions like § 4(a) of the LHWCA], in effect, made the employer for the purposes of the compensation statute, it is obvious that he should enjoy the regular immunity of an employer from third-party suit when the facts are such that he could be made liable for compensation." 2A Larson, *supra*, § 72.31(a), at 14–112.

Our only difficulty in adopting the majority view is that it requires a slightly strained reading of the word "employer." As we have repeatedly admonished courts faced with technical questions arising under the LHWCA, "the wisest course is to adhere closely to what Congress has written." *Rodriguez* v. *Compass Shipping Co.*, 451 U. S. 596, 617 (1981); see *Director, OWCP* v. *Rasmussen*, 440 U. S. 29, 47 (1979). Absent convincing evidence of contrary congressional intent, we are reluctant to depart from this sound canon of statutory construction. However, upon reviewing the use of the term "employer" elsewhere in the Act, we find ample evidence to infer that Congress intended the term "employer" to include general contractors as well as direct employers.

The second sentence of § 4(a) provides that "unless the subcontractor has secured [worker's] compensation," the contractor "shall secure the payment of such compensation."

---

[9] As discussed below, courts have differed as to what it means for a general contractor to secure compensation in accordance with § 4(a). See *infra*, at 936–940.

This section clearly assumes that contractors have the capacity to secure compensation for subcontractor employees. Securing compensation is a term of art in this area of law. Under the LHWCA, compensation can be secured only through the procedures outlined in § 32(a) of the LHWCA. See *supra*, at 928. However, § 32(a) speaks only of insurance being secured by an "employer." 33 U. S. C. § 932(a). Because the LHWCA requires that contractors secure compensation for subcontractor employees under certain circumstances, the term "employer" as used in § 32(a) must be read to encompass general contractors.

Similarly, under § 4(a), contractors are made liable for payment of "compensation payable under sections 7, 8, and 9." These three sections refer exclusively to employers' making payments; they contain no references to contractors. See 33 U. S. C. §§ 907(a), 908(f). For purposes of these sections as well, contractors would appear to qualify as statutory employers.

Further evidence that contractors can be employers under the LHWCA is found in § 33(b), which governs the assignment of an injured worker's right to recover damages from third parties to the worker's "employer." 33 U. S. C. § 933(b); see *Rodriguez* v. *Compass Shipping Co.*, *supra*. It is difficult to believe that Congress did not intend for contractors making compensation payments under § 4(a) to receive assignments under § 33(b) or that Congress wanted the assignment to run to a worker's actual employer, who may never have secured any compensation insurance. Accordingly, it seems highly probable that "employer" as used in § 33(b) also covers contractors.

Finally, there are the enforcement provisions of § 38 of the Act, 33 U. S. C. § 938. It is generally assumed that contractors who fail to comply with the requirements of § 4(a) may be liable for § 38's criminal penalties. App. 263–265, 299. This assumption seems reasonable, for, if contractors are not covered by § 38, then the LHWCA contains no apparent

mechanism for enforcing the second sentence of § 4(a). But, once again, § 38 refers only to "[a]ny employer required to secure the payment of compensation under this Act." If contractors are truly liable under § 38, then contractors must be considered statutory employers.

From the foregoing examples, it is clear that Congress must have meant for the term "employer" in other sections of the LHWCA to include contractors.[10] It is reasonable to infer that Congress intended the term "employer" to have that same broad meaning in § 5(a). This is particularly so inasmuch as granting tort immunity to contractors that comply with § 4(a) is consistent with the *quid pro quo* underlying workers' compensation statutes. For both of these reasons, we adopt the majority view that general contractors can be embraced by the term "employer" as used in § 5(a).

## B

Having concluded that § 5(a) can cover general contractors, we now consider the conditions under which contractors may qualify for § 5(a)'s immunity. The Court of Appeals took the view that to qualify for § 5(a)'s grant of immunity, "WMATA must *first* require its subcontractors to purchase the insurance. It is only by providing compensation insurance *when the subcontractors fail to do so* that WMATA obtains immunity as a statutory employer." 230 U. S. App. D. C., at 303, 717 F. 2d, at 582 (emphasis in original). This view—

---

[10] In *Probst* v. *Southern Stevedoring Co.*, 379 F. 2d 763, 767 (1967), the Fifth Circuit characterized a contractor's duty to secure compensation for subcontractor employees as "secondary, guaranty-like liability." See also *Johnson* v. *Bechtel Associates Professional Corp.*, 230 U. S. App. D. C. 297, 305, 717 F. 2d 574, 582 (1983). This characterization is apt to the extent that general contractors do not have to secure compensation for these workers "unless the subcontractor" fails to provide insurance. 33 U. S. C. § 904(a). However, this description of a contractor's duty in no way diminishes the fact that, once a statutory obligation to secure compensation attaches, the contractor must qualify as an "employer" under §§ 7, 8(f), 32(a), 33(b), and 38 in order for its obligation to make any sense under the Act.

that § 5(a) covers general contractors only if the contractor secures compensation after the subcontractor actually defaults—is consistent with the opinions of several other federal courts. See, *e. g.*, *Probst* v. *Southern Stevedoring Co.*, 379 F. 2d 763, 767 (CA5 1967); *Thomas* v. *George Hyman Construction, Co.*, 173 F. Supp., at 383.

The Court of Appeals' interpretation of the LHWCA rests on the notion that general contractors are entitled to the reward of tort immunity only when the contractor has been statutorily required to secure compensation. In essence, the Court of Appeals would withhold the *quid* of tort immunity until the contractor had been legally bound to provide the *quo* of securing compensation. Though plausible given the logic of workers' compensation statutes,[11] the Court of Appeals' view is difficult to square with the language of the LHWCA.

Section 5(a) does not say that employers are immune from tort liability if they secure compensation in accordance with the Act. The section provides just the obverse—that employers shall be immune from liability unless the employer "fails to secure payment of compensation as required by this Act." Immunity is not cast as a reward for employers that secure compensation; rather, loss of immunity is levied as a penalty on those that neglect to meet their statutory obligations.

---

[11] See *supra*, at 931–932. In any workers' compensation scheme, the onus of securing compensation falls in the first instance on a worker's immediate employer, even when that employer is a subcontractor. In order to ensure that contractors do not prematurely relieve subcontractors of their responsibility for securing compensation, Congress might have tried to discourage general contractors from securing compensation unless and until a subcontractor actually defaulted on its own statutory obligation. Indeed, several States have adopted workers' compensation statutes with such a phased obligation to secure compensation. See, *e. g.*, Neb. Rev. Stat. § 48–116 (1978); Ind. Code § 22–3–2–14 (1982). Under these regimes, it might make sense to adopt the Court of Appeals' view that tort immunity should extend only to those general contractors that secure compensation after a subcontractor defaults on its obligation.

Since we have already determined that contractors qualify as employers under § 5(a), the most natural reading of § 5(a) would offer general contractors tort immunity so long as they do not fail to meet their statutory obligations to secure compensation. Under § 4(a), a contractor "shall be liable for and shall secure [compensation] unless the subcontractor has secured such payment." Contrary to the Court of Appeals' reading of the Act, this provision contains no suggestion that the contractor must make a demand on its subcontractors before securing compensation or that the contractor should forestall securing compensation until the subcontractor has affirmatively defaulted. Rather, the section simply places on general contractors a contingent obligation to secure compensation whenever a subcontractor has failed to do so. Taken together, §§ 4(a) and 5(a) would appear to grant a general contractor immunity from tort suits brought by subcontractor employees unless the contractor has neglected to secure workers' compensation coverage after the subcontractor failed to do so.

Besides being faithful to the plain language of the statute, this reading furthers the policy underlying the LHWCA, which is to ensure that workers are not deprived workers' compensation coverage. If the benefits of securing compensation insurance—that is, tort immunity—did not accrue to contractors until subcontractors had affirmatively elected to default, then contractors would be reluctant to incur the considerable expense of securing compensation insurance until they were absolutely convinced that subcontractors were in statutory default. Inevitably, such a rule would create gaps in workers' compensation coverage—a result Congress clearly wanted to avoid. The reason for passing the LHWCA was to bring one of the last remaining groups of uninsured workers under the umbrella of workers' compensation.[12]

---

[12] In endorsing the LHWCA, the House Judiciary Committee recommended that "this humanitarian legislation be speedily enacted into law so

A further argument in favor of accepting the natural reading of §§ 4(a) and 5(a) is that it saves courts from the onerous task of determining when subcontractors have defaulted on their own statutory obligations. If a contractor's tort immunity were contingent upon an affirmative default on the part of subcontractors, then every time a subcontractor employee sued the general contractor after recovering compensation under the contractor's compensation policy, the contractor would be forced to establish that the worker's direct employer had been given a reasonable chance to secure compensation for itself and then had failed to respond to the opportunity. Nothing in the LHWCA or its legislative history suggests that Congress intended to unleash such a difficult set of factual inquiries. And it is unlikely that Congress would silently impose such a barrier to contractor immunity.[13]

As the natural reading of §§ 4(a) and 5(a) comports with the policies underlying the LHWCA and is consistent with the legislative history of the Act, there is no cause not to "adhere closely to what Congress has written." *Rodriguez* v. *Compass Shipping Co.*, 451 U. S., at 617. We conclude, therefore, that §§ 4(a) and 5(a) of the LHWCA render a general

---

that this class of workers, practically the only class without the benefit of workmen's compensation, may be afforded this protection, which has come to be almost universally recognized as necessary in the interest of social justice between employer and employee." H. R. Rep. No. 1190, 69th Cong., 1st Sess., 3 (1926); accord, S. Rep. No. 973, 69th Cong., 1st Sess., 16 (1926).

[13] The absence of discussion is made more telling because of industry objections to other provisions in the original LHWCA that called for companies to monitor the insurance coverage of other firms. In § 38 of the 1927 Act, Congress required that before employing a stevedoring firm, the owner had to obtain a certificate proving that the firm was insured in compliance with the Act. 44 Stat. (part 2) 1442. The administrative ramifications of this provision sparked considerable debate during congressional hearings. See, *e. g.*, Compensation for Employees in Certain Maritime Employments: Hearings on S. 3170 before a Subcommittee of the Senate Judiciary Committee, 69th Cong., 1st Sess., 48, 98, 101 (1926).

contractor immune from tort liability provided the contractor has not failed to honor its statutory duty to secure compensation for subcontractor employees when the subcontractor itself has not secured such compensation. So long as general contractors have not defaulted on this statutory obligation to secure back-up compensation for subcontractor employees, they qualify for § 5(a)'s grant of immunity.

## III

Applying our interpretation of § 4(a) and § 5(a) to the facts of this case, we conclude that WMATA was entitled to immunity from the tort actions brought by respondents. Far from "fail[ing] to secure payment of compensation as required by [the LHWCA]," 33 U. S. C. § 905(a), WMATA acted above and beyond its statutory obligations. In order to prevent subcontractor employees from going uninsured, WMATA went to the considerable effort and expense of purchasing "wrap-up" insurance on behalf of all of its subcontractors. Rather than waiting to secure its own compensation until subcontractors failed to secure, WMATA guaranteed that every Metro subcontractor would satisfy and keep satisfied its primary statutory obligation to obtain worker's compensation coverage.[14] Due to the comprehensiveness of its "wrap-

---

[14] Although the Court of Appeals left the question open, see 230 U. S. App. D. C., at 306, n. 16, 717 F. 2d, at 583, n. 16, the uncontested facts of this case establish that these subcontractors fulfilled their statutory obligation to secure compensation. WMATA bought its "wrap-up" policy "for the benefit of" the contractors. See *supra*, at 929–930. Respondents' employers contributed to WMATA's "wrap-up" policy by reducing the bids they submitted for work on the Metro project. Upon being awarded their jobs, these subcontractors received a certificate of insurance, naming them as insured parties. By thus participating in WMATA's "wrap-up" program, these subcontractors "in substance if not in form" secured compensation for purposes of § 32(a)(1) of the LHWCA. 2A A. Larson, Law of Workmen's Compensation § 67.22, pp. 12–83 (1982); accord, *Edwards* v. *Bechtel Associates Professional Corp.*, 466 A. 2d 436 (D. C.), cert. denied, 464 U. S. 995 (1983). Because these subcontractors are also "employers"

up" policy, WMATA's statutory duty to secure back-up compensation for its subcontractor employees has not been triggered since the second phase of Metro construction began, and WMATA has therefore had no opportunity to default on its statutory obligations established in § 4(a). Under these circumstances, it is clear that WMATA remains entitled to § 5(a)'s grant of tort immunity.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

The Court today takes a 1927 statute and reads into it the "modern view" of workers' compensation, whereby both the contractor and the subcontractor receive immunity from tort suits provided somebody secures compensation for injured employees of the subcontractor.[1] In practical terms, the result is undoubtedly good both for the construction industry

---

for purposes of § 5(a) and because they have not failed to secure the compensation required by the Act, they would also appear entitled to immunity from tort liability.

[1] The Court appears to qualify the "modern view" in one respect. The Court implies that an affirmative default by the subcontractor would strip the subcontractor of its statutory immunity even if the contractor fulfilled its backup obligation to secure compensation. *Ante,* at 940–941, n. 14. In that case the contractor, but not the subcontractor, would receive immunity. Aside from the fact that this view requires precisely the difficult factual inquiry which the Court, in another portion of its opinion, *ante,* at 939, says Congress could not have intended, the result is paradoxical. Contractors will receive greater protection from suit than subcontractors under the statute even though, as the Court admits, it requires "a slightly strained reading of the word 'employer'" to grant immunity to contractors at all. Under the Court's reading, as long as anyone secures compensation for the employees of the subcontractor, the contractor is immune from a third-party tort suit. But the subcontractor receives immunity only if it itself secures the compensation, whether directly or, as here, indirectly.

and for our already congested district courts. The result may even make overall economic sense. See 2A A. Larson, Law of Workmen's Compensation § 72.31(b) (1982). But one can hardly pretend that it "adhere[s] closely to what Congress has written." *Rodriguez* v. *Compass Shipping Co.*, 451 U. S. 596, 617 (1981). The Court has simply fixed upon what it believes to be good policy and then patched together a rationale as best it could. Believing that it is for Congress, not this Court, to decide whether the LHWCA should be updated to reflect current thinking, I dissent.

The Court admits, as it must, that the subcontractors in this case have "secured" the payment of compensation to their employees as required by § 4(a) of the LHWCA. *Ante*, at 940–941, n. 14. The fact that those subcontractors did not each sign the check that paid for the "wrap-up" insurance policy is beside the point. The policy was purchased for their benefit, bore their names as the insured parties, and was paid for in the form of reduced bids. See App. 104, 106, 113. In subscribing to this "wrap-up" scheme, the subcontractors fulfilled their statutory obligation to secure compensation. An alternative view would not only exalt form over substance; it would also subject most of the 355 subcontractors and 2,765 sub-subcontractors working on the second phase of the Metro construction to criminal prosecution under § 38(a) merely because they did not purchase additional, wholly superfluous insurance for their employees.

The Court also admits that WMATA has *not* "secured" the payment of compensation to the employees of the subcontractors within the meaning of § 4(a). . Under § 4(a), a contractor has a secondary, contingent obligation. As the Court explains, the contractor need secure compensation only when a subcontractor has failed to do so. *Ante*, at 938. Since the subcontractors in this case did not default on their statutory obligations, WMATA's secondary obligation never matured. Therefore, WMATA was not "liable for" and did not "secure" the payment of compensation under § 4(a). The fact that

WMATA "acted above and beyond its statutory obligations" by arranging for the "wrap-up" insurance, *ante*, at 940, is, thus, beside the point.[2] Because the subcontractors met their § 4(a) obligations, WMATA's duty was never triggered "and WMATA has therefore had no opportunity to default on [or to satisfy] its statutory obligations." *Ante*, at 941.

Despite these two concessions, the Court still concludes that WMATA is entitled to the immunity of § 5(a). Contractors such as WMATA are, thus, cast in the role of backup quarterbacks who get paid for sitting on the bench. They need do nothing; as long as the starting quarterbacks perform, the backups receive equal benefits.

The Court reaches this conclusion by means of a rather clumsy sleight of hand. In Part II–A, the Court argues that the term "employer" as used in the LHWCA must be capable of embracing contractors. Otherwise, when a subcontractor defaulted on its § 4(a) duty, there would be no way of enforcing or even making sense of the backup duties imposed on contractors since all the statutory provisions other than § 4(a), which flesh out the obligation imposed by that section, speak only of an "employer." In Part II–B, the Court then argues that the language of § 5(a) grants immunity to an "employer" unless the employer fails to honor its statutory duty to secure compensation. Since the statutory duty of a contractor does not even arise until the subcontractor defaults, a contractor has not failed to honor its statutory duty as long as the subcontractor secures compensation. Thus, WMATA

---

[2] It is clear from the Court's opinion that WMATA would have received the statutory immunity of § 5(a) even if it had played no part in obtaining the "wrap-up" insurance for the subcontractors. The Court states that "§§ 4(a) and 5(a) of the LHWCA render a general contractor immune from tort liability provided the contractor has not failed to honor its statutory duty to secure compensation for subcontractor employees when the subcontractor itself has not secured such compensation." *Ante*, at 939–940. In other words, if the subcontractor secures the required insurance, the contractor need not raise a finger in order to gain the immunity of § 5(a).

receives the immunity of § 5(a) as an "employer" who has not "failed" in its statutory duty.

The problem with this argument is that the term "employer" is given one meaning in Part II–A, but is then used in a different sense in Part II–B. That is, for purposes of the duty to secure compensation in § 4(a), a contractor is seen as only a backup "employer" who steps into that role when the subcontractor—the actual employer—defaults. But for purposes of the immunity granted in § 5(a), the Court treats a contractor as a full-fledged employer, filling that role regardless whether the subcontractor defaults or not.

Even assuming that a contractor can be an "employer" for purposes of the LHWCA,[3] a contractor at best fills that role contingently. A contractor is certainly not an "employer" of the subcontractor's employees for all purposes and at all times under the statute. Otherwise, to continue the previous metaphor, there would be two quarterbacks on the field at all times. Both the contractor and the subcontractor would be directed to make the payments required by §§ 7, 8, and 9, and both would simultaneously be entitled to the assignment of the injured worker's right to recover damages

---

[3] The Court makes a persuasive argument that the term "employer" in the LHWCA must in some circumstances be read to embrace contractors. But the argument is by no means conclusive. The definition of "employer" given in § 2(4) contains no hint that Congress intended such a reading. And in § 4(a), "employer" is used in direct contrast to "contractor." Also, § 4(a) specifically directs a contractor, upon default by the subcontractor, to secure the payment of "the compensation payable under sections 7, 8, and 9." Thus, since those three sections are incorporated by reference, the word "employer" in them need not, as the Court claims, be read to embrace contractors in order for them to give content to the contingent liability of contractors. On the other hand, it is reasonable to conclude that Congress intended contractors, upon default by subcontractors, to be subject to the enforcement provisions of § 38 and, if they secure compensation, to be entitled to the assignment of third-party tort suits under § 33(b). Those sections do speak only of an "employer." Fortunately, in my view, it is unnecessary to resolve the question in this case.

from third parties under § 33(b). Everything directed by the Act would be done in duplicate.

Thus, even accepting the Court's analysis in Part II–A, the most that follows is that a contractor becomes an "employer" within the meaning of the various provisions of the LHWCA when the subcontractor has defaulted on its statutory obligations. It follows that a contractor is an "employer" entitled to the immunity of § 5(a) *only* when the subcontractor has defaulted on its obligation and the contractor has stepped in to secure the payment of compensation to the subcontractor's employees.

The Court's reading of the statute, alternately contracting and expanding the term "employer," is, therefore, internally inconsistent.[4] That reading also runs counter to the settled

---

[4] Aside from its "plain language" claim, the Court offers two additional arguments in favor of its reading of the statute. Neither is worth much. First, the Court argues that if contractors did not receive immunity until subcontractors had affirmatively elected to default, inevitable gaps in coverage would occur because "contractors would be reluctant to incur the considerable expense of securing compensation insurance until they were absolutely convinced that subcontractors were in statutory default." *Ante*, at 938. But that same reluctance will be present regardless of the scope of immunity afforded contractors by § 5(a). Even if they are granted immunity whenever the subcontractor secures compensation, contractors will still be reluctant to incur the "considerable expense" of securing compensation insurance unless they are sure that the subcontractors have not done so. Otherwise, the money is simply thrown away gratuitously. The Court offers no reason to believe that its tortured reading of the statutory language provides any extra incentive for contractors to obtain insurance for the employees of subcontractors. Furthermore, standard workers' compensation coverage for contractors apparently already includes backup, contingent coverage for the employees of subcontractors. The contractor only has to pay for that backup insurance if it is unable to show that the subcontractor has secured the necessary coverage. National Council on Compensation Insurance, Basic Manual for Workers' Compensation and Employers' Liability Insurance, Rule IX–C, pp. R–20–21 (3d reprint 1983). Thus, gaps in coverage are not likely to occur.

Second, the Court argues that a rule granting immunity to a contractor who secures insurance only after default by the subcontractor would

principle that a provision limiting common-law rights "must be strictly construed, for '[n]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.' *Shaw* v. *Railroad Co.*, 101 U. S. 557, 565." *Herd & Co.* v. *Krawill Machinery Corp.*, 359 U. S. 297, 304–305 (1959). The common-law right of the respondents in this case to maintain a negligence action against WMATA has been eliminated on what seems to me to be a less than fair reading of the statute. Accordingly, I dissent.

---

require a difficult factual inquiry into whether "the worker's direct employer had been given a reasonable chance to secure compensation for itself and then had failed to respond to the opportunity." *Ante*, at 939. As noted, however, see n. 1, *supra*, the very same factual inquiry is required by the Court's own reading, which would deny immunity to defaulting subcontractors.