515 So.2d 1123 (1987)
Richard SIDER
v.
ROBIN TEMPORARY SERVICE, et al.
No. 87-CA-328.
Court of Appeal of Louisiana, Fifth Circuit.
November 9, 1987.
Rehearing Denied December 17, 1987.
Writ Denied February 12, 1988.
*1124 Paul G. Aucoin, Vacherie, for Richard Sider, plaintiff-appellant.
Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, James F. Shuey, New Orleans, for The Valley Line Co. and A & M Fleeting & Towing, Inc., defendants-appellees.
Before CHEHARDY, GRISBAUM and WICKER, JJ.
WICKER, Judge.
Richard Sider (Sider) plaintiff/appellant filed a claim pursuant to the Jones Act, and alternatively, Louisiana negligence law as to executive officers, safety personnel and co-employees against defendants/appellees A & M Fleeting and Towing, Inc. (A & M) and the Valley Line Company (Valley).[1] At the close of Sider's case-in-chief the trial judge granted defendants/appellees' motion for involuntary dismissal pursuant to L.S.A.-C.C.P. Art. 1672 and rendered judgment in favor of defendants/appellees on November 17, 1986. From this adverse judgment, Sider appeals. We affirm.
On March 15, 1983 Sider was assigned by Robin, a temporary labor service, to clean barges at A & M's barge-washing facility located on the Mississippi River near Vacherie, Louisiana. While cleaning a barge owned by Valley, he fell from a ladder while carrying a siphon plate weighing approximately 15 pounds.
On September 14, 1983 Sider filed a suit against the following defendants: (1) Robin; (2) Valley; (3) A & M; (4) Armant Fleet; (5) A B C Corporation (the owner of the barge on which he was injured); (6) Executive officers and safety personnel of each of the above-named defendants; (7) Lloyd and/or British Companies, the Insurers of Valley and A & M, and (8) Insurance Company *1125 of North America (INA), Robin's insurer.
In his petition, Sider sued for Jones Act damages pursuant to 46 U.S.C.A. Section 688 and in the alternative under Louisiana Negligence Law as to executive officers, safety personnel and coemployees.
On September 12, 1984 a motion for summary judgment was filed on behalf of Valley and A & M seeking to dismiss the Jones Act claim. On October 18, 1985, Robin joined in that motion. On October 23, 1985 the trial judge denied the motion for summary judgment, referring the matter to the merits.[2]
On July 1, 1986 a partial motion to dismiss was granted dismissing by compromise Robin and its insurer, INA.
At the close of Sider's case-in-chief, the trial judge granted defendants' motion for involuntary dismissal on November 17, 1986.
Sider now specifies the following errors:
1. That the trial court erred in granting defendants' motion for involuntary dismissal by failing to address or rule on each and every cause of action presented by plaintiff;
2. That the trial judge erred in failing to find seaman status;
3. That the trial judge erred in finding that plaintiff was the "borrowed employee" of A & M, thus precluding Sider from asserting his rights pursuant to the Louisiana Negligence Law as it pertains to the negligent actions of executive officers, safety personnel and co-employees;
4. That the trial court erred in not allowing plaintiff to pursue his negligence action as it pertained to negligent acts of executive officers, safety personnel and co-workers of the defendant, Valley, when in fact the court made no finding that Sider was Valley's "borrowed employee", and when that was their only defense against such an action;
5. That the trial judge erred in not allowing testimony concerning the corporate structure of Chromalloy American Corporation and its wholly owned subsidiaries, when answers to these questions were within the knowledge of the witness testifying at the time;
6. That the trial court erred in not allowing Susan Smith to testify within her field of expertise concerning the functional disability of plaintiff and furthermore in not allowing plaintiff to offer such testimony in the form of proffer; and
7. That the trial court erred in failing to grant plaintiff a new trial.
ROBIN'S RELATIONSHIP WITH A & M:
George W. Fairfield (Fairfield) testified that on the date of Sider's accident, he (Fairfield) was part-owner and manager of Robin. He described Robin as a temporary help service which furnished workers to customers for short or long term jobs on either a regular or irregular basis.
In Sider's case, A & M was the customer. A & M was charged for the services performed by Sider; however, Sider was paid by Robin.
Robin had agreed to send men to A & M's Armant Fleet of barges located in Vacherie, Louisiana, on an as-needed basis for the purpose of washing barges.
The agreement between Robin and A & M was in effect two months before the accident.
William Fancher (Fancher), A & M's fleet superintendent corroborated Fairfield's testimony regarding the agreement between A & M and Robin. Fancher testified that A & M used temporary help for seven or eight months on an as-needed basis. In October or November, 1983, A & M discontinued using Robin until 1986.
Either Fancher or Lewis Rowe (an Assistant Manager/Superintendent for Valley) would contact Robin to send men to wash barges. Fancher further testified that only A & M's deckhands would tie or *1126 untie the barges. Rowe testified that the men from Robin were used strictly for washing barges.
Anthony Fletcher, the barge-washer foreman, also testified that when the barge-washing was completed he would send the temporary men home.
According to Rowe, A & M is part of the Valley Line/Chromalloy Corporation; however, Rowe did not know the relationship between Valley and A & M. Mr. Shuey, Counsel for Valley and A & M stated for the record that "A & M Fleeting and Towing is a domestic Corporation that is either wholly owned by the Valley Line Company or by Chromalloy American Corporation, I don't know which."
Fairfield stated that Robin's employees have to be present at its offices at 5:00 A.M. or early enough to go out on a job. Robin sends labor out to fulfil a customer's order. Robin gave no training to its employees nor did Robin test the employees in any way to determine whether they could wash barges. A & M determined whether the Robin employee met its needs. Additionally, A & M supplied equipment and tools. The only items furnished by Robin were hard hats, boots or shoes. Furthermore, A & M supervised the Robin employees.
Sider also testified that on March 15, 1983, Robin sent him to A & M to wash barges in Vacherie. When he arrived at A & M he received instructions from a supervisor who spoke to the entire group of men.
Both Rowe and Fairfield testified that if a Robin employee had performed satisfactorily, A & M would request that individual to return. Fairfield testified that Sider was actually filling a spot for Chapman who had worked at A & M previously but who failed to show at Robin on the date of the accident. If Chapman had shown on that date he would have been given preference. Moreover, Fletcher testified that A & M would check "yes" or "no" as to whether the men were needed the next day.
Sider testified that he was 33 years of age on the date of the accident. He began working for Robin in 1982 doing physical labor. The jobs he had for Robin prior to the A & M job were those of a firewatcher, a painter and chipper of a rig, and general labor. He had never washed barges before the A & M assignment.
Rowe explained that A & M is a barge cleaning and repair company. A & M does not own any barges; it strictly services barges at any of its three cleaning locations. The A & M site at which Sider was injured was known as the Armant Fleet at Vacherie, Louisiana.
Rowe stated that approximately 100 barges are located there each day. He further noted that probably 100 barges were at the Armant Fleet the day Sider was injured. Fancher testified that as many as 160 or 170 barges were probably there in March, 1983 when the accident occurred.
Fletcher stated that the barges in the fleet were floating on the Mississippi River. The barges were tied to a spar barge. Fancher described spar barges as permanent barges which, although they do float, do remain in place. Both Fletcher and Fancher testified that the barges had been recently unloaded and were at A & M's facility to be washed before reloading.
According to Fancher, A & M could wash 15 barges in one day. Thus, the composition of the barges would change daily. He also stated that A & M does not exclusively service barges owned by Valley, the owner of the barge on which Sider was injured; it services other lines as well.
PROCEDURE FOR CLEANING BARGES:
Fletcher testified that his immediate supervisor, Rowe, was in charge of establishing the safety procedures to be used at the barge-washing facility and that Rowe was responsible for instructing the Robin personnel who were working for A & M. Rowe testified that he, Rowe, would give Fletcher the work assignment and that Fletcher would then assign men to a barge.
According to Fletcher, although a safety meeting would be called periodically to discuss how to tie ladders and how to pull up heavy objects, this meeting was not called every day. Fancher testified that Fletcher was responsible for seeing that the ladder *1127 was tied properly and that Fletcher was in charge of instructing the crew on the tying off of the ladder. Fletcher felt that it was necessary for safety that the ladder be tied properly; however, he could not recall whether he mentioned the proper tying procedure on the date of the accident.
Fancher stated that while a barge was present at the A & M facility, A & M was responsible for it. According to Fletcher, A & M supplied the ladders, pumping equipment, hoses, squeegees and shovels used in the cleaning process. He described the ladders as 20-foot aluminum single-pieces with a rope woven into each of them. In fact, Fletcher was in charge of seeing that the ropes were woven into each ladder. Fancher further described the ladder as having a rotating device at the bottom with rubber pads so it would fit flush at one end.
Fletcher did not know the members of the crew to which Sider was assigned. Both he and Fancher stated, however, that no special person (i.e. A & M or Robin personnel) was assigned the task of placing the ladder. No one at trial had any knowledge as to who in fact did place the ladder off of which Sider fell.
Fancher stated that he was familiar with the proper procedure of tying the ladder. However he was not present on the morning of the accident and did not know whether instructions had been given in this regard. He explained that the purpose of tying the ladder was to keep it immobile. He testified that "[t]he ladder was secured by a rope to the barge cover, the grain cover, to keep from shifting from the side or sliding downwards. You can still push the ladder upward when you're in there."
Rowe testified that the normal procedure for climbing the ladder involved two people. One person would go down the ladder and the other would stay on top, holding the ladder on the bottom. Fancher testified, however, that all a person has to do to determine whether a ladder is tied securely is to pull on the ladder. Neither Fancher nor Fletcher knew whether Sider had been instructed to make certain that the ladder was secure.
Rowe testified that two or three men were assigned to a cleaning crew with one of the members knowledgeable about the procedure. Rowe stated that only two members comprised Sider's crew with both Sider and the other member being employees of Robin. He further stated that during the month of the accident A & M had a group of Robin personnel who were knowledgeable about the cleaning procedure.
Sider, however, testified on direct that his crew consisted of two people from Robin and one from Valley. On cross, he stated that one member was an A & M employee who had done the job before and another was George Johnson, a Robin employee.
Sider admitted having received instructions from the A & M employee regarding cleaning barges. Sider testified that after each member was assigned life jackets they proceeded to the spar barge, taking hoses from the spar barge out to the barge being cleaned. The hoses were hauled to the barge farthest from shore and the wash crew would then work its way back onto shore. The spar barge was the fourth barge from shore.
Sider explained that high pressure hoses as well as an air hose were used in the cleaning process. The crew washed the outside of the barge first with a high pressure hose. Next, they "cracked" the "head" of the barge open in order to place the ladder down into the bottom of the barge. Sider denied placing the ladder, nor did he know who had placed the ladder in the barge on which he was injured. Fletcher also did not know who placed the ladder.
Sider related that the next step was to hose out the inside of the barge to clean it of any residual grain or other material. The remaining debris was then sucked out by a pump. Rowe stated that the debris would be discharged into the river.
After the barge was cleaned, then the water hose was pulled up, the suction hose was taken off the suction plate and the plate was tied to a rope and lifted up from above. In addition, buckets, squeegees and brooms were all lifted up with a rope from above.
*1128 Although Sider admitted that the proper procedure was to tie the suction plate to a rope and have it lifted up, he did not follow that procedure on the second barge he washed. He stated that no one sent a rope back for the plate although he yelled for one. When no one responded he carried the 15-pound suction plate on his shoulder as he climbed the ladder one step at a time with his other hand. There was no impediment to his climbing the ladder and retrieving the rope himself.
Sider stated that he was two-thirds of the way up when the ladder shifted to his right at a distance of one to two feet. When the two-foot wide ladder shifted, he grabbed the ladder tightly and the ladder hit the side of the barge causing him to fall approximately 12 to 15 feet onto the bottom of the barge. Fletcher stated that from the floor to the top of the barge was 15 to 16 feet while Fancher stated that the distance was 17 to 18 feet. Sider felt that if the ladder had been tied properly he would not have fallen.
When Sider went down the ladder in the second barge he had no problemsit did not sway or wobble. He stated, however, that he did not check to see whether the ladder was secure.
Fletcher testified that he arrived approximately one minute after the accident. He did not know whether the ladder was in the same position as when Sider fell. He felt that the ladder could only have moved about six inches. He was certain that the ladder could not have moved as much as the two feet described by Sider.
Rowe also arrived at the accident scene. He was certain that the ladder was tied off. He further testified that several people used the ladder after the accident. He stated that A & M had had no prior trouble with that ladder and that both he and Fletcher inspected the ladders daily. If the ladder was defective, it was not used.
SEAMAN STATUS:
The primary issue is whether Sider is entitled to claim the status of a seaman under the Jones Act, 46 U.S.C., Section 688. The trial judge concluded that Sider was not a seaman for purposes of the Jones Act.
The test for determining seaman status is set forth in Offshore Company v. Robison, 266 F.2d 769, 779 (5th Cir.1959) as follows:
that the injured workman was assigned permanently to a vessel [o]r performed a substantial part of his work on the vessel; and [t]he capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips [Footnote omitted.].
However, the Robison, supra test is a guideline rather than a mechanical test. Bouvier v. Krenz, 702 F.2d 89 (5th Cir. 1983). It serves "as a guide in weighing the total circumstances of an individual's employment to determine whether they had sufficient nexus with the navigation of vessels and the perils attendant thereon to implicate the concerns of the Jones Act. [Citations omitted.]" 702 F.2d at 90.
Furthermore, "Jones Act benefits [are] available only to maritime workers who are not covered by the LHWCA [33 U.S.C., Sections 901-950]." Pizzitolo v. Electro-Coal Transfer Corp., 812 F.2d 977, 983 (5th Cir.1987). "The LHWCA limits the broad term `seaman' so that only `member[s] of a crew of a vessel' are exempted and permitted to be covered by the Jones Act. [Footnote omitted.]" Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1070 (5th Cir.1986). Seamen are distinguished from landbased harbor workers for the purposes of Jones Act coverage. Pizzitolo, supra.
We find no error with the trial judge's denial of seaman status. The record establishes that Sider was assigned by Robin to A & M, a barge repair and cleaning service. Sider's sole duty was to clean various barges. Although the barges were floating on the Mississippi River, they were never in motion as he performed the cleaning operation. His work assignment *1129 to A & M was transitory rather than permanent. In addition, the barges he cleaned would vary daily.
Although Sider correctly notes that seaman status does not require an assignment to a single vessel, Braniff v. Jackson Ave.Gretna Ferry, Inc., 280 F.2d 523 (5th Cir.1960), nevertheless the jurisprudence requires a "vessel relationship that is substantial in point and time and not merely spasmodic." Bertrand v. International Mooring & Marine, Inc., 700 F.2d 240, 247 (5th Cir.1983), cert. den., 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).
Moreover, if a workman was not assigned permanently to a vessel, then he must have performed substantial work "aboard a vessel or an identifiable or recognizable fleet of vessels. [Citations omitted.]" White v. Valley Line Co., 736 F.2d 304, 306 (5th Cir.1984).
On appeal, Sider's counsel argues that Sider had a substantial relationship[3] *1130 to vessels belonging to the Chromalloy Corporation or to one of its wholly owned subsidiaries, and thus should be afforded seaman status. The trial judge in concluding that Sider was not entitled to seaman status, evidently decided that Sider did not have a substantial relationship to an identifiable or recognizable fleet of vessels. White, supra.
The finding that A & M was not an identifiable or recognizable fleet of vessels, White, supra, is supported by the record. Rowe testified that A & M is a barge cleaning and repair company and does not own any barges. Additionally, he indicated that probably 100 barges were at the A & M facility the date of the accident; while Fancher testified that as many as 160 to 170 barges were probably there in March, 1983. Furthermore, according to Fancher the composition of the barges would change daily. Also, Fancher stated that A & M did not exclusively service barges owned by Valley; it services other lines as well.
LHWCA:
In order to fall within the LHWCA, a worker "must satisfy both a `status' and a `situs' test." Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S.Ct. 1421, 1423, 84 L.Ed.2d 406 (1985). While Sider is not a member of a crew for the purposes of the Jones Act; nevertheless at the time of his injury he was cleaning a barge located in navigable waters. Cleaning a vessel located in navigable waters has been held to confer maritime status under the LHWCA. Hite v. Maritime Overseas Corporation, 375 F.Supp. 233 (E.D.Tx.1974).
Furthermore, regarding Sider's relationship to A & M, the court noted in Hebron v. Union Oil Co. of California, 634 F.2d 245, 247 (5th Cir.1981) that:
An employee of one person or company may become the servant of another person or company if he is transferred by the former with his own consent or acquiescence to the employ of the latter. Gaudet v. Exxon Corp., 562 F.2d 351, 355 (5th Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253-54, 56 L.Ed.2d 414 (1978). The central question in borrowed servant cases is whether someone has the power to control and direct another person in performance of his work. Id.

As noted in Champagne v. Penrod Drilling Company, 341 F.Supp. 1282, 1284 (W.D.La.1971), affirmed 459 F.2d 1042 (5th Cir.1972), cert. denied, 409 U.S. 1113, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973):
[v]arious criteria have been considered in determining whether the doctrine of `borrowed,' `loaned,' or `rented' employee is applicable. No one factor is decisive. No fixed test is used to determine the relationship. The following have been given greater weight:
A. Control of the employee.
B. Control over the work.
C. Some type of agreement, understanding or meeting of the minds between borrower, lender and employee.
D. Whose tools are used.
E. Whose work is being performed.
F. The duration of the employment.
G. The right to discharge and the obligation to pay. Ruiz v. Shell Oil Company (5th Cir., 1969), 413 F.2d 310.
We also held recently that "[Louisiana and Federal jurisprudence] fully recognizes that neither control nor any other single factor is decisive, and no fixed test is used to determine the existence of a borrowed servant relationship." Brumbaugh v. Marathon Oil Co., 507 So.2d 872, 875 (La. *1131 App. 5th Cir.1987), writ denied 508 So.2d 824 (La.1987).
In Huff v. Marine Tank Testing Corp., 631 F.2d 1140 (4th Cir.1980), the court concluded that a welder was the borrowed employee of the company to which he had been assigned by his nominal employer. In Huff, supra, the worker was supervised and directed by the company to which he had been assigned. Furthermore, the assigned company was solely responsible for the working conditions and encountered hazards. Huff, supra. Like Sider, the worker in Huff, supra, was subject to discharge if the assigned company were dissatisfied with his work.
Although Sider was paid by Robin, he was clearly directed and supervised by A & M in its cleaning operations. It was A & M who supplied the cleaning equipment.
We find no error in the trial court's conclusion that Sider was the borrowed employee of A & M. Therefore, since Sider was the borrowed employee of A & M he is covered by the LHWCA and that act is his exclusive remedy against A & M. Hebron, supra; Gaudet, supra; Garret v. Dean Shank Drilling Co., Inc., 799 F.2d 1007 (5th Cir.1986); Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083 (5th Cir.1987). FEDERAL PREEMPTION and LHWCA 905(b) IN RELATIONSHIP TO VALLEY:
33 U.S.C.A., Section 905(b) (pre-1984) provided that:
In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter. [Emphasis supplied.]
Sider's counsel concedes in brief that if this court finds that Sider is not a seaman, then he is unquestionably a longshoreman or maritime worker under the jurisdiction of the LHWCA. He also agrees that under the LHWCA Sider is barred from suing his employer in tort. However, he contends that his sole employer is Robin.
Counsel also points out that although the trial court found Sider to be A & M's "borrowed employee", it made no such finding with respect to Valley. Counsel then asserts that since Sider is not Valley's "borrowed employee" it is not immune from a tort suit.
Sider's counsel states that he is not pursuing a 905(b) action for vessel negligence against Valley, the owner of the barge, but instead is pursuing a tort claim under Louisiana law. During oral argument he stated that a 905(b) action was pending in federal court but that he did not believe that such an action applied.
Counsel cites the case of Trussell v. Litton Systems, Inc., 753 F.2d 366 (5th Cir. 1984), for the proposition that a plaintiff can pursue a state negligence action against a vessel owner which is completely distinct and separate from a 905(b) action. Moreover, he asserts that a plaintiff can choose either to pursue a 905(b) action or a state tort action.
We find Trussell, supra, inapposite to the case at bar. In Trussell, supra, the plaintiff was employed by Frigitemp Marine Corp., a subcontractor of Litton Systems, Inc. (Litton). Litton's task was to *1132 repair a ship. The Trussell court held that Litton was not an owner nor an owner pro hac vice of the vessel on which the injury occurred. In addition, the court concluded that "Even if Litton is subject to suit as vessel charterer, we agree with the district court's conclusion that plaintiff's section 905(b) action is barred because her injuries were caused by fellow shipbuilders. [Footnote omitted.]" id. at 368. Thus, the court held that Trussell did not have a 905(b) action.
The Trussell court noted that Trussell could pursue a state tort claim. As explained in Louviere v. Marathon Oil Co., 755 F.2d 428 (5th Cir.1985):
[Regarding pre-1984 LHWCA] Washington Metropolitan Area Transit Authority v. Johnson, [467 U.S. 925], 104 S.Ct. 2827, 2835, 81 L.Ed.2d 768 (1984) established that under sections 4(a), 5(a) of the Longshoremen's and Harbor Workers' Compensation Act (Act), 33 U.S.C., Sections 904(a), 905(a) a general contractor was immune from tort suits brought by a subcontractor's employees unless the contractor neglected to secure compensation coverage for those employees after the subcontractor failed to do so. Id. at 429.
Sider was injured on a vessel which was owned by Valley. He therefore has a 905(b) action against Valley, unlike Trussell who was suing someone other than a vessel owner. Trussell, supra. Importantly, Trussell, supra, did not hold "that Section 905(b) included negligence actions other than those torts within the admiralty jurisdiction of federal courts." Christoff v. Bergeron Industries, Inc., 485 So.2d 639, 642 (La.App. 4th Cir.1986).
We next consider whether Sider's state law claim against Valley is preempted by the LHWCA. By its very terms, 905(b) has an exclusivity provision. In addition, we recently noted in Christoff, supra, at 641, that federal jurisprudence has held:
[a]lthough state courts have concurrent jurisdiction with federal courts to hear 905(b) actions, Jackson v. Lykes Brothers Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967), the state courts may not enlarge the substantive federal rights. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); Koninklyke Nederlandsche, etc. v. Strachan Shipping Co., 301 F.2d 741 (5th Cir.), cert. denied 371 U.S. 921, 83 S.Ct. 288, 9 L.Ed.2d 230 (1962).
See also Hebron, supra.
Sider's only claim against Valley is a 905(b) action. He cannot bring a Louisiana negligence claim due to the exclusive provision of 905(b). Since he insists that he is not pursuing a claim for vessel negligence we do not address the merits of a 905(b) action. Accordingly, we find no error in the trial judge's failure to consider a Louisiana negligence claim.
INVOLUNTARY DISMISSAL:
At the close of plaintiff's case, defense counsel moved for involuntary dismissal pursuant to L.S.A.-C.C.P. Art. 1672(B) which provides that:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Defense counsel argued that Sider was not a seaman, instead that he fell within the LHWCA and was only entitled to a negligence action against the vessel owner pursuant to 905(b). Sider's counsel urged seaman status and alternatively argued coverage under LHWCA, Louisiana tort law with regard to negligence actions against supervisory personnel of the defendant corporations, and Louisiana Worker's Compensation Law.
The trial judge granted defense counsel's motion for involuntary dismissal. He stated that:

*1133 The question or questions presented are legal in nature. I didn't want to decide them adversely to you without a full trial, without full opportunity to present anything and everything you can. I think the law is against you, Mr. Aucoin [Sider's counsel]. I don't think he falls under the seaman or the maritime worker. I think your remedies are workman's compensation under the law.
Later, in the judgment rendered November 17, 1986, the trial court held that Sider was not entitled to seaman status but that he was entitled to claim the status of a maritime worker under the LHWCA. He also concluded that Sider had no action in tort against his borrowing employer, A & M, and that Sider had not proven his case of vessel negligence against Valley.
In his first specification of error appellant argues that the trial court in granting the motion for involuntary dismissal failed to rule on every cause of action presented in Sider's petition. In support of his argument he contends that the trial judge's oral reasons given at the conclusion of the trial make it evident that he was ruling solely on the issue of Sider's status as a seaman.
Sider's counsel is correct in noting that the trial judge's statements presented above which were given at the conclusion of trial, do not address all of the causes of action asserted by Sider. However, we conclude that all causes of action were disposed of in the trial court judgment which followed.
In Bordelon v. Dauzat, 389 So.2d 820, 822 (La.App. 3rd Cir.1980), the court held in line with prior jurisprudence that:
Prior to final judgment, a trial judge may, at his discretion, change the substance or the result of interlocutory rulings. Labourdette v. Doullut and Williams Shipbuilding Co., 156 La. 412, 100 So. 547 (1924); Arnold v. Stupp Corporation, 249 So.2d 276 (1st Cir. 1971); Grady v. Allstate Insurance Co., 355 So.2d 1070 (4th Cir.1978); Jarvis v. Lafayette General Hospital, 373 So.2d 1000 (3rd Cir.1979), on remand 379 So.2d 1179 (3rd Cir.1980). A trial judge may also sign a judgment based on written reasons which differ substantially from previously stated oral reasons. Margan v. Precision Motors, Inc., 317 So.2d 664 (4th Cir.1975).
We find no merit to appellant's argument that the trial court's granting of the motion for involuntary dismissal was erroneous on the basis that it did not dispose of all of Sider's claims since the judgment rendered on November 17, 1986 does dispose of those claims.
Sider's counsel also argues that even if the judge's ruling that Sider is the borrowed employee of A & M is correct, the trial court did not rule that Sider was the borrowed employee of Valley and therefore Sider still has a Louisiana negligence action against Valley. For our reasons discussed in the section entitled LHWCA we agree with the trial court's conclusion that vessel negligence (i.e. a 905(b) action) would have to be proven against Valley.
Additionally urged by counsel is the argument that since defense counsel did not affirmatively plead the defense of "borrowed employee" the trial judge did not have that issue before him. In Brumbaugh, supra, we held that "tort immunity under the `borrowed servant' doctrine is an affirmative defense within the context of a tort action [Citations omitted.]." 507 So.2d at 875. See also, L.S.A.-C.C.P. Art. 1005 and Freeman v. Chevron Oil Company, 517 F.2d 201 (5th Cir.1975).
Our review of the record indicates that the issue of whether Sider was the "borrowed employee" of A & M and/or Valley was raised for the first time by Robin in a motion for summary judgment filed on May 8, 1986. Robin argued in its motion that Sider was the "borrowed employee" of A & M and/or Valley and that Robin should therefore be dismissed from the suit on that basis.
On May 15, 1986, A & M filed an opposing memo to Robin's motion for summary judgment urging that the motion for summary judgment was premature. A & M did not deny status as the borrowing employer, instead, it argued that the "borrowed employee" status was a factual issue which *1134 should be resolved at trial rather than through a motion for summary judgment.
Trial began on July 15, 1986, the same date as the dismissal of Robin from the suit through compromise. At trial, evidence regarding "borrowed employee" status was introduced without objection.
We noted in Brumbaugh, supra, that "the policy behind La.C.C.P. art. 1005 [is to give] the plaintiff fair notice of the defense [of `borrowed servant'] and [to prevent] surprise." Id. at 874. In the instant case, Sider was placed on notice that the defense of "borrowed employee" would be an issue at trial.
Furthermore, "[t]he general rule established by the jurisprudence is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any of the issues raised by the pleadings, and hence, would have been excluded if objected to timely". Austrum v. City of Baton Rouge, 282 So.2d 434, 436 (La.1973).
Therefore, introduction without objection, of testimony regarding the criteria for determining "borrowed employee" status, Ruiz, supra; Champagne, supra, expanded the pleadings and put the issue of "borrowed employee" before the court. Additionally, the trial judge was obviously mindful of the evidence presented regarding the criteria for "borrowed employee" status since he particularly held that A & M was Sider's borrowing employer. Thus, we find no merit to counsel's argument that the issue of "borrowed employee" was not before the trial court.
In the instant case, defense counsel moved for involuntary dismissal pursuant to L.S.A.-C.C.P. Art. 1672(B). "[t]he court must grant the motion for dismissal if plaintiff fails to establish his case by a preponderance of the evidence. Cosse v. Bruley, 445 So.2d 41 (La.App. 4th Cir. 1984)." Rose v. Louisiana Power and Light Co., 474 So.2d 1006, 1009 (La.App. 5th Cir.1985).
We find that the trial court's conclusions are amply supported by the record and we accord great weight to his factual findings in light of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We also find that the trial judge's legal conclusions are correct. Thus, we conclude that the trial court did not err in ruling that Sider failed to establish his case by a preponderance of the evidence. Furthermore, we conclude that the trial court did not err in failing to grant Sider's motion for a new trial.
Therefore, the judgment of the trial court granting defendant's motion to dismiss is affirmed. All costs are to be borne by Sider.
AFFIRMED.
NOTES
[1] On July 15, 1986, Sider's claims against defendants, Robin's Temporaries, Inc. (Robin) and its insurer were dismissed pursuant to a compromise settlement.
[2] We denied writs from that judgment in No. 85-C-748, Sider v. Robin Temporary Service, et al., on December 30, 1985 wherein we stated that "Considering the showing made and the opposition, we cannot conclude that the trial judge is clearly wrong in choosing to have a trial on the merits."
[3] Related to Sider's contention that the barges he cleaned were all owned or subsidiaries of the Chromalloy Corporation, is his fifth specification of error. In that assignment of error Sider contends that the trial court erred in not allowing testimony concerning the corporate structure of Chromalloy and its wholly owned subsidiaries when the answers to questions posed were within the knowledge of the witness testifying at the time.

In Moliere v. Wright, 487 So.2d 587, 588 (La. App. 4th Cir.1986) the Fourth Circuit held that:
[w]hen a trial judge rules the testimony of a witness inadmissible, an offer of proof, or proffer, may be made, C.C.P. Art. 1636. Counsel who contends his evidence has been improperly excluded, must proffer it. Without a proffer, there is no record of the evidence for this court to review on appeal. Having made no proffer of the [excluded] testimony, appellant may not complain of this alleged error on appeal. [Citations omitted.]
In addition, whenever counsel acquiesces in the trial court's ruling as indicated by a failure to object, to provide the court with a statement of the testimony to be illicited or to state why he should be allowed to proceed with questioning, then the issue is not preserved on appeal. Grusich v. Grusich, 447 So.2d 93 (La.App. 4th Cir. 1984). Merely citing it as error in brief is insufficient under those circumstances. Grusich, supra.
On two occasions Sider's counsel attempted to question Fletcher regarding the corporate relationship of Chromalloy, Valley and A & M. Defense counsel objected on the basis that no predicate or foundation was laid. The trial court sustained the objections each time; however, Sider's counsel made no attempt to establish a foundation, object, state why he should be allowed to proceed with the questioning without laying a foundation, or proffer the excluded testimony. Instead, Sider's counsel proceeded to another line of questioning.
With regard to Sider's counsel's questioning of Fancher, the following colloquy occurred:
Q. Now, does the A & M Fleeting and Towing, Inc. Company itself own any of the barges which it cleans and washes and maintains and repairs?
A. I really can't answer that. I don't know.
Although Fancher stated that he did not know the answer, Sider's counsel persisted in asking about the ownership of the barges and their relationship to Chromalloy. When defense counsel objected to the failure to lay a predicate, the trial judge sustained the objection in part. The trial court allowed Sider's counsel to question Fancher as to his impression or what he was given to understand, but stated for the record that Fancher lacked the expertise to establish title to the barges. Sider's counsel made no objection to the ruling, did not offer a proffer and did not attempt to lay a predicate.
Later, on two other occasions Sider's counsel attempted to question Fancher regarding the corporate relationship. Defense counsel objected to the line of questioning for failure to lay a predicate and to establish the competency of the witness. When the trial court sustained the objections, Sider's counsel proceeded to another line of questioning.
Sider's counsel also questioned Jack Quinn (Quinn), a Valley employee. It is unclear from the record the position held by Quinn at the time of the accident. Quinn stated that he "believed" Valley was a subsidiary of Chromalloy. When Quinn was asked whether A & M fell under the same corporate structure of Chromalloy, defense counsel objected to questions regarding Quinn's beliefs. After the court sustained the objection, Sider's counsel made no objection, no proffer, no attempt to lay a foundation and no statement explaining why he should question Quinn regarding his beliefs.
Having acquiesced in the rulings of the trial court and making no attempt to preserve the issue for appeal, we find that counsel's statements in brief are insufficient to preserve assignment of error number five for appellate review. Grusich, supra; Moliere, supra.
Also raised as error is appellant's contention that Susan L. Smith (Smith), an expert in the field of occupational therapy and vocational evaluation, should have been allowed to testify regarding Sider's functional disability. Additionally, Sider argues that the trial judge's refusal to permit a proffer of Smith's testimony in this regard was error.
On two occasions the trial court prohibited Sider's counsel from questioning Smith beyond her area of expertise regarding the permanency of Sider's condition or the effects of engaging in certain physical activity. Sider's counsel did not object and proceeded to another line of questioning.
Later, Sider's counsel attempted to proffer questions "with respect to disabilities and conclusion [Smith] came to in her evaluations of [S]ider" After hearing argument by both counsel, the trial court evidently concluded that any further testimony from Smith would be repetitive when he stated that "I don't think it would add anything." Sider's counsel's response was "All right. I have no further questions."
Since we find that Sider's counsel agreed with the trial court's ruling, we do not find that his asserted error in specification number six has been preserved for appellate review. Grusich, supra; Moliere, supra. Furthermore, we note that Smith did in fact testify regarding her conclusions as to Sider's abilities to function in job situations.