RYAN, INC., and another, Appellants, V. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents.

*No. 325. Argued June 5, 1968.—Decided June 28, 1968.*
(Also reported in 159 N. W. 2d 594.)

---

648

For the appellants there was a brief by *Otjen, Philipp & McFadyen* and *Carl N. Otjen,* all of Milwaukee, and oral argument by *Carl N. Otjen.*

For the respondents Department of Industry, Labor & Human Relations and the State of Wisconsin the cause was argued by *Donald P. Johns,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

ROBERT W. HANSEN, J. The industrial commission found "That at the time of accident causing the death of Joseph Browne, he was an employee of Ryan, Incorporated of Wisconsin . . ." and "that the fatality arose out of and occurred while Joseph Browne was performing services incidental to his employment with Ryan, Incorporated of Wisconsin . . . ." The issue on this appeal is whether there is credible evidence to sustain such findings, applying the essential tests to be used in determining whether a loaned (or borrowed) employee retains his employment with his original employer or becomes the employee of the special employer.

The vital tests or questions in controversies of this kind are four-fold: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was

the work being done? [1] Of these four tests, this court has stated that "the most-important one is the first, viz., did the employee actually or impliedly consent to work for the special employer." [2] Applied to this case, this test inquires not whether Joseph Browne agreed to adjust or help adjust the piece of road scraping equipment, but whether he consented to leave his employment with Ryan, Incorporated of Wisconsin and become the employee of Bark River Culvert & Equipment Company. [3] For such result, it is essential that the employee understands the existence of and agree to the temporary new relationship. [4] Unless such consensual relationship, express or implied, exists between the employee and the borrowing or special employer, there is a presumption that the employee continues in his general employment and liability under the Workmen's Compensation Act remains with the general employer and does not shift to the special employer.

These cases and this approach give great weight to the right of an individual worker to choose his employer and not to be transferred to some special employer without his consent. This result is intended for, as a standard text in the field of workmen's compensation law puts it:

". . . In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered 'yes,' the investiga-

---

[1] *Seaman Body Corp. v. Industrial Comm.* (1931), 204 Wis. 157, 163, 235 N. W. 433, quoted with approval in *Springfield Lumber, Feed & Fuel Co. v. Industrial Comm.* (1960), 10 Wis. 2d 405, 410, 102 N. W. 2d 754.

[2] *Hanz v. Industrial Comm.* (1959), 7 Wis. 2d 314, 316, 96 N. W. 2d 533, quoted with approval in *Springfield Lumber, Feed & Fuel Co. v. Industrial Comm., supra,* footnote 1, at page 409.

[3] *Supra,* footnote 2, at 7 Wis. 2d 318.

[4] *Edwards v. Cutler-Hammer, Inc.* (1956), 272 Wis. 54, 56, 74 N. W. 2d 606.

tion is closed, and there is no need to go on into tests of relative control and the like." [5]

In the case now before us, we find, as did the trial court on review, that the evidence and reasonable inferences arising therefrom support the commission's finding that Joseph Browne had not left his general employment with Ryan, Incorporated of Wisconsin at the time of the fatal accident. This burden of proof has not been met, and, under the general fact situation here presented, we do not see how it could have been.

The facts leading up to the unfortunate lunch hour attempt to adjust the road scraper are largely undisputed. Upon arriving at the construction site, the machine was turned over to operators employed by the general employer, Ryan. Ryan employees operated the machine in performing their regular duties that morning for approximately four hours. One of the Ryan employees complained that the machine was not operating properly. There followed a discussion between Ryan employees and the Bark River representative as to fixing the machine at or away from the construction worksite. Ryan operators indicated their opinion that the machine could be adjusted without a crane at the construction worksite. Ryan's master mechanic stated that Ryan employees could not provide assistance in making the adjustments until 1:30 or 2 o'clock. It clearly was anticipated that the Ryan employees would make or help make the required adjustment after the lunch hour. What happened during the lunch period began with the suggestion by a Ryan operator to the Bark River representative that he ask the deceased to make the necessary adjustment on the machine. The deceased agreed and the ill-fated attempt at fixing the machine began. There is testimony in the record that it was common practice in the industry and

---

[5] 1 Larson, *Law of Workmen's Compensation*, pp. 710, 711, sec. 48.10.

the policy of the general employer to have the contractor's mechanics assist in the repairs and adjustments of demonstration equipment. There was testimony of a recently hired Ryan mechanic that he was aware, one day after he was hired, of the Ryan policy of having its mechanics assist in the repair and adjustment of demonstration machines as long as the Ryan equipment was functioning properly and did not need mechanic's attention. In the light of such common practice and specific company policy, it is difficult to find a basis for holding that Joseph Browne, when he began adjusting the road scraper machine, was leaving his employment as a Ryan employee and intending to become an employee of Bark River. He had not been ordered by his immediate Ryan superior to do this work, but he had not been ordered not to do so. He did what other Ryan employees had done on previous occasions and it appears clear that he did what he did as a Ryan employee.

We do not hold that the only reasonable inference that might be drawn from the record before the industrial commission is that Joseph Browne was the employee of the general employer at the time of his death. We do hold that the inference drawn by the commission was a reasonable inference and we do find that there is ample credible evidence in the record to sustain the commission's finding.

*By the Court.*—Judgment affirmed.