COFFEY, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s decision affirming the district court’s finding that Cardiovascular Surgery Associates were not responsible for the alleged malpractice of Dr. Stanford under the Wisconsin Borrowed Servant Doctrine. I am compelled to dissent because the district court and the majority of the panel of this court have misconstrued Wisconsin’s Borrowed Servant Doctrine. The proper application of the decisions of Wisconsin’s Supreme Court to the facts of this case mandates that this court hold that Dr. Stanford was an employee of CVSA and that any negligence attributed to him should have been included in CVSA’s settlement with the plaintiff. Moreover, the trial court erred when it determined that the primary benefit of Dr. Stanford’s surgical assistance to Cardiovascular Surgery Associates inured mainly to the benefit of the government. In reaching this conclusion, the court disregarded the basic premise of Wisconsin’s Borrowed Servant Doctrine requiring a court to focus on the question of whether the special employer or the general employer received the primary benefit from the specific task the employee was performing at the time of the injury. Thus, the proper legal analysis required that the trial court focus on whether CVSA or the government received the primary benefit from Mrs. Green’s operation rather than mistakenly focusing on whether the government or CVSA benefited from Dr. Stanford’s entire (six month) fellowship program with CVSA. Furthermore, because under Wisconsin’s law Dr. Stanford’s negligence must be imputed to CVSA and therefore included in CVSA’s settlement with the plaintiff, in holding the government liable for Dr. Stanford’s negligence the majority of this court also erred in implicitly recognizing and adopting the “dual benefit” theory expressly rejected by the Wisconsin Supreme Court less than two years ago in DePratt v. Sergio, 102 Wis.2d 141, 306 N.W.2d 62 (1981).
I.
In analyzing the panel’s decision, I note that the majority opinion concedes that “the test for determining whether an employee qualifies as a borrowed servant under Wisconsin law required four questions to be answered in the affirmative.” Citing Seaman Body Corp. v. Industrial Comm., 204 Wis. 157, 163, 235 N.W. 433 (1931). Both the decisions of the district court and the majority of this panel take issue only with the government’s evidence concerning the fourth prong of the borrowed servant test, i.e., whether the work primarily benefited the special employer, and although they failed to discuss or analyze them, they apparently accept the fact that the government met the first three prongs of the borrowed servant test mandated by the state Supreme Court. However, I would hold at the outset that the district court committed a fundamental error when it decided to apply the fourth test almost in a vacuum, separate and distinct from the other three tests; every Wisconsin case on point analyzes each of the four tests in conjunction with one another in order that they might come to a logical and well-reasoned decision on the issue of whether the special employer (CVSA) is liable for the borrowed servant’s (Dr. Stanford’s) alleged negligence under the Borrowed Servant Doctrine.
The first test to be applied under Wisconsin’s Borrowed Servant Doctrine is whether the employee consented to work for the special employer. It is clear that Dr. Stanford sought after and actively pursued a fellowship with CVSA and that he in fact accepted the fellowship position and assisted other CVSA surgeons during the tenure *1167 program. Moreover, cusing on Mrs. Green’s operation, it is readily apparent that Dr. Stanford consented to work in conjunction with and under the direction of a CVSA surgeon (Dr. Mullen) who was responsible for supervising all of the members of CVSA’s surgical team, including not only Dr. Stanford but also the physician’s assistant, the perfusionist, the anesthesiologist and the surgical nurses. Thus, the element of consent is unquestionably present.
The second prong of the four part test is whether the employee was performing a segment of the special employer’s (CVSA’s) work at the time of the injury. It is beyond dispute that when Dr. Stanford, a surgeon previously certified by the Ameri-can College of Surgeons, opened Mrs. Green’s chest cavity, exposed her heart, administered Heparin and cannuated the heart he was performing a required preparatory segment of the CVSA heart by-pass surgical procedure. Mrs. Green was a patient of CVSA and (1) CVSA’s surgeons examined Mrs. Green and after analyzing previous test data determined the necessity and extent of heart surgery required (i.e., a double, triple or quadruple by-pass); (2) CVSA scheduled the surgery; (3) CVSA’s personnel supervised all of the in-patient preparatory testing performed immediately prior to Mrs. Green’s surgery; (4) CVSA personnel supervised Mrs. Green’s post-operative care; and (5) it is unquestioned that CVSA was to receive payment for the surgical procedure. After review, I would hold that the evidence, though not discussed or analyzed in either the opinion of the district court or the opinion of the majority of this panel, is more than sufficient to establish that Dr. Stanford was performing CVSA’s “work” at the time of the injury, and thus the second prong of Wisconsin’s borrowed servant test has been met.
The third element of the Wisconsin borrowed servant test is whether the special employer had the right and the authority to control and supervise the details of the operation (work) being performed by Dr. Stanford, the “borrowed servant,” at the time of the injury. Again, there is no dispute that Cardiovascular Surgery Associates (specifically the surgeon in charge. Dr. Mullen) had the right, and in fact the duty and obligation, to control, direct and supervise each and every detail and step of Mrs. Green’s heart by-pass surgical procedure including any services performed by the nurses and other surgical personnel, as well as any assistance given by Dr. Stanford. The plaintiff does not even attempt to claim that the government failed to establish that CVSA was in fact in complete control over each and every detail of the operation. Clearly, the first three prongs of Wisconsin’s borrowed servant test have been met.
In the face of the overwhelming evidence that the first three prongs of the borrowed servant test were established by the government, both the district court and the majority paid no heed to the first three tests and concluded that through the application of only the fourth (primary benefit) test, CVSA was not liable for Dr. Stanford’s actions under the Borrowed Servant Doctrine because the government primarily benefited from Dr. Stanford’s fellowship with CVSA. It is my opinion that the district court and the majority, in the face of Wisconsin case law to the contrary, failed to analyze all four borrowed servant tests in conjunction with one another and incorrectly focused all of their inquiry on the fourth prong of the borrowed servant test. The Wisconsin Supreme Court has never suggested that the “primary benefit” test is the most important test, and in fact has specifically stated to the contrary and held that “[o]f these four tests, ... ‘the most important one is the first [test], viz., did the employee actually or impliedly consent to work for the special employer.’ ” Ryan, Inc. v. ILHR Dept., 39 Wis.2d 646, 650, 159 N.W.2d 594 (1968). See also Springfield Lumber v. Indus. Comm., 10 Wis.2d 405, 409, 102 N.W.2d 754 (1960). Moreover, other cases from the Wisconsin Supreme Court and the federal court for the Eastern District of Wisconsin hold that the answer to the first test, the employee’s consent to work for the special employer, can be implied from the application of the *1168 third test, i.e., “the employee’s acceptance of the special employer’s control and direction.” Springfield Lumber, 10 Wis.2d at 411, 102 N.W.2d 754. It is thus clear from Wisconsin cases that the factors of consent and control are the most crucial factors to be considered by a court, and these factors overwhelmingly establish CVSA’s liability and are not disputed by the parties in the instant case. Since Dr. Stanford expressly consented to work for CVSA, because he was performing CVSA’s work at the time of the injury and as CVSA had the sole duty, right and obligation to control the details of Mrs. Green’s operation, I would hold that those three elements combined with the benefit which flowed to CVSA from Dr. Stanford’s assistance during Mrs. Green’s heart by-pass operation require that any negligence imputed to Dr. Stanford be considered as the negligence of CVSA under Wisconsin’s Borrowed Servant Doctrine.
I would also hold, based on Wisconsin case law as it has been consistently applied for at least fifty years, see Seaman Body Corp. v. Indus. Comm., 204 Wis. 157, 235 N.W. 433 (1981), that the trial court made a fundamental error concerning the focus of the fourth question: whether the work of Dr. Stanford was for the primary benefit of the government or CVSA. Rather than focusing on Mrs. Green’s specific operation, the district court mistakenly focused on the entire length (six months) of Dr. Stanford’s ' fellowship program and the events allegedly leading up to his participation in the fellowship program, and erroneously concluded that the primary benefit of the fellowship flowed to the United States Air Force. However, legal reasoning required the trial court to conduct a balancing test and focus on the question of which employer (the government or CVSA) derived the primary benefit from the specific operation (Mrs. Green’s heart by-pass) which is the subject matter of this lawsuit. I know of no legal basis under Wisconsin’s Borrowed Servant Doctrine to support the district court’s analysis of the entire fellowship program including the fifty to sixty operations Dr. Stanford had previously assisted in pri- or to Mrs. Green’s, in coming to the conclusion that the primary benefit flowed to the government. Wisconsin cases hold that the question of “primary benefit” is “somewhat analogous to the second test,” i.e., “[wjhose was the work [the employee] was performing at the time of the injury.” Huckstorf v. Vince L. Schneider Ent., 41 Wis.2d 45, 53, 163 N.W.2d 190 (1968) (emphasis added). See also “Finagrain” Compagnie Com. etc. v. Miller Compressing Co., 349 F.Supp. 288, 292 (E.D.Wis.1972). Since the second test focuses only on the specific act giving rise to the injury and is analogous to the fourth test, this unquestionably demonstrates that when answering the “primary benefit” test, controlling Wisconsin law required the district court to focus on Mrs. Green’s operation and not upon the events leading up to and during Dr. Stanford’s fellowship training program.
Wisconsin’s Supreme Court, in all the cases interpreting the Borrowed Servant Doctrine, focuses the searchlight of the fourth prong of Wisconsin’s “borrowed servant test” on what occurred during the specific act giving rise to the injury, the subject matter of the lawsuit (i.e., the operation itself). For example, in Huckstorf, the plaintiff was injured when he was struck by a bundle of plywood sheets that had been prematurely released by a crane operator at a construction site. In holding the special employer liable, it is significant to note that when applying each of the four prongs of the borrowed servant test, most notably the “primary benefit” test, the Huckstorf court properly focused only on the specific act giving rise to the injury itself, and not on the entire three months the crane operator worked for the general contractor. Under the Huckstorf analysis, in the instant case the trial court should have focused solely on Mrs. Green’s operation when answering the “primary benefit” test rather than analyzing Dr. Stanford’s entire fellowship program. Focusing on the negligent act itself, the Huckstorf court held that “[i]t was certainly to the benefit of [the general contractor] to have the plywood moved to facilitate its obligation to construct the building.” Huckstorf, 41 *1169 Wis.2d at 54, 163 N.W.2d 190. Similarly, in the instant case it was certainly to the benefit of CVSA to have Dr. Stanford assist in the preparation of Mrs. Green as well as in the heart surgery itself, and thus facilitate the heart by-pass procedure. Since Huckstorf requires this court to focus only on one specific act (Mrs. Green’s heart bypass operation) when answering each of the four prongs of the borrowed servant test, it would strain legal logical reasoning to now allow the district court to misapply Wisconsin case law by shifting gears and broadening the scope of the analysis to include Dr. Stanford’s fellowship program (6 months) only when answering the fourth test, the “primary benefit” test.
In a similar case, “Finagrain” Compagnie Com. etc. v. Miller Compressing Co., 349 F.Supp. 288 (E.D.Wis.1972), the plaintiffs ship was damaged due to the negligence of a crane operator. The defendant Miller Compressing, the general contractor, had leased both the crane and the operator from Best Cranes and attempted to avoid liability for the crane operator’s negligence by claiming the operator was still an employee of Best Cranes. The court disagreed, holding that Miller Compressing, as the “special employer,” was liable for the damages caused by the crane operator’s negligence. In applying the Huckstorf decision to the facts before it the court noted that the crane operator reported directly to the loading site “and received all his instructions, down to the most precise detail, from Miller’s employees.” Finagrain, 349 F.Supp. at 291. In the instant case, Dr. Stanford reported directly to CVSA surgeons and received all of his instructions for the Green operation “down to the most precise detail” from CVSA’s medical data and personnel. In Finagrain, while it was true that the operator was paid by the owner of the crane, the court held that the question of whether the special employee is paid by the general employer or the special employer “is never decisive and rarely a significant factor.” Similarly, although the Air Force paid Dr. Stanford’s salary, that fact is not decisive and is an insignificant factor here. Further, the Finagrain court went on to note that because both employers generally receive some benefit regardless of how minute or small, “benefit is not a sufficiently discriminating test.” 349 F.Supp. at 292. Contrary to Finagrain, the majority of this court bases its holding solely upon the slender reed of the primary benefit test, which is not of itself a “sufficiently discriminating test.” Rather than relying upon the primary benefit test alone, the Finagrain court held that courts should look to the employer that has the immediate “control” and ask “whether the employee ‘acted like’ a contractor, coming in for the job and controlling the way he performed it, or whether he was assimilated into the temporary employer’s team.” 349 F.Supp. at 292. In the instant case, there can be no doubt but that Dr. Stanford participated in the Green operation under the supervision, control and direction of CVSA and was “assimilated into [CVSA’s] team” as a temporary employee. Because Dr. Stanford was acting as an employee of CVSA and received his instructions “down to the most precise detail” and CVSA’s surgeon in charge, and since CVSA received the “primary benefit” from his assistance in Mrs. Green’s operation. I would hold that under the Wisconsin Borrowed Servant Doctrine, CVSA, not the government, is liable for Dr. Stanford’s negligence.
The majority of this court assumes that the government received a substantial benefit, and in so doing, the majority adopts the district court’s misapplication of Wisconsin’s Borrowed Servant Doctrine and states that because Dr. Stanford “himself sought the unpaid fellowship at CVSA in order to improve his surgical skills,” the benefit must necessarily flow to the Air Force. However, the majority’s reasoning is not supported by the record since even if Dr. Stanford did in fact state that he sought the fellowship to improve his surgical skills, it does not follow that the Air Force would necessarily receive a benefit therefrom. Contrary to the majority’s assumption, I do not understand how any improvement in Dr. Stanford’s skills would be of benefit to- the government for Dr. *1170 Stanford testified that even before he sought or accepted his fellowship with CVSA, he was planning his retirement and severance from the Air Force within the next year, at the time he would have completed his twenty years of service. This period of time is within months after the completion of the fellowship program. The majority’s assumption that the government would receive a benefit from Mrs. Green’s operation also ignores the fact that prior to Mrs. Green’s operation Dr. Stanford had spent more than four months learning heart by-pass procedures under the direction of CVSA’s surgeons, and had assisted in numerous other heart by-pass operations prior to Mrs. Green’s surgery, and that during these previous operations Dr. Stanford had been instructed and supervised by CVSA’s surgeons. At the time of the Green operation, any improvement in Dr. Stanford’s skills had reached the point of no return and the potential minute benefit, if any, which would flow to the government from this particular surgical procedure had Dr. Stanford intended to remain in the Air Force was almost nonexistent when compared to the “primary” benefit (i.e., the significant medical fees) which flowed solely to CVSA from Dr. Stanford’s assistance as a borrowed servant.
From the above analysis it is clear the district court and the majority of this panel have misapplied Wisconsin’s law, and it is unquestionable that under the Federal Tort Claims Act, when determining whether the government is liable for the alleged negligence (malpractice) of one of its employees, it is unquestioned that federal courts are bound to apply “the law of the [state] where the act or omission occurred.” 28 U.S.C. § 1346(b). See also Dornan v. United States, 460 F.2d 425 (9th Cir.1972) (“Whether or not a particular act of negligence occurs within the scope of an employee’s federal employment depends upon an analysis of the facts under the law of the place [state] where the tort occurred”); Haas v. United States, 492 F.Supp. 755 (D.Mass.1980) (Medical malpractice suit against the government is governed by the law of the state where the injury occurred).
While it may be true that the government would receive a slight benefit from Dr. Stanford’s improved skills if he had in fact intended to remain in the Air Force (which he did not) and teach and perform other surgery on Air Force personnel (which the record does not substantiate), Wisconsin law mandates that the main focus of our inquiry must be on who received the primary benefit from the particular operation which is the subject matter of this lawsuit, that of Mrs. Green, and not merely on whether the government received some benefit. A logical medical, economic and legal analysis of the facts reveals that the primary benefit from the participation of Dr. Stanford, or any other surgeon, in Mrs. Green’s operation flowed directly to CVSA. Indeed, there is absolutely no evidence in the record to support a finding that the government received the primary benefit from Dr. Stanford’s assistance during Mrs. Green’s surgery. Since Dr. Stanford was performing the duty of the assisting physician during Mrs. Green’s operation, CVSA did not have to hire another surgeon to assist in the heart by-pass procedure, including but not limited to Dr. Stanford opening Mrs. Green’s chest cavity, cannulat-ing her heart prior to the heart by-pass procedure itself and inspecting the placement of the tubes from the heart/lung machine. Although testimony at trial did not reveal the exact fee paid to an assisting surgeon acting in Dr. Stanford’s capacity, CVSA physicians did testify that the fee was “significant.” After analyzing the decisions of the trial court and this court’s majority, I note that both decisions ignore the fact that CVSA saved thousands of dollars while utilizing the services of Dr. Stanford instead of hiring another surgeon, and further place great weight on the argument that since the Air Force paid Dr. Stanford’s salary, the Air Force must have received a benefit from his work with CVSA. This reasoning finds no support in the record and ignores economic reality in that although the government paid Dr. Stanford’s salary, he was not operating on Air Force personnel and I fail to see how *1171 government received any direct benefit from Dr. Stanford’s medical services during that period of time.
The trial court developed the novel theory that the Air Force benefited by assigning Dr. Stanford to Milwaukee because the Air Force was able to avoid the potentially embarrassing situation of other doctors at Wilford Hall complaining about Dr. Stanford’s questionable surgical skills and inflated mortality rates. However, contrary to the trial court’s reasoning, the Air Force could have avoided the conflict at Wilford Hall by simply transferring Dr. Stanford to another Air Force base hospital and assigning him to medical duties outside of the operating room, such as in a first aid, emergency room setting or teaching hospital aides. If the Air Force had done so, it would have achieved the goal of relieving alleged peer pressure at Wilford Hall and the Air Force personnel would also have received the continued benefit of Dr. Stanford’s medical skills being applied to Air Force personnel while he was paid his full salary.
If the Air Force had simply wished to allow Dr. Stanford to “hide out” as asserted by the trial court, the Air Force could have transferred him to an Air Force base much more distant than Milwaukee, such as one on Wake Island, thousands of miles away across the Pacific, or any one of ten or twelve other Air Force bases on foreign soil where Dr. Stanford could have continued to serve Air Force personnel in a capacity other than as a surgeon while still receiving his salary and thus directly benefit the Air Force. There is nothing in the record, other than the trial court’s novel idea, to substantiate the plaintiff’s theory that the government received any benefit whatsoever from transferring Dr. Stanford to Milwaukee rather than to the Aleutian Islands. Because the Air Force chose to allow Dr. Stanford to work in Milwaukee with CVS A, I would hold that CVSA reaped the enormous and primary benefit of not having to pay the thousands of dollars in salary to another surgeon, and if we are to correctly apply Wisconsin’s Borrowed Servant Doctrine as mandated by Wisconsin’s Supreme Court, we must reverse the trial court’s ruling that the primary benefit from Dr. Stanford’s fellowship program flowed to the government.
II.
In affirming the district court the majority erroneously asserts that “even if it were true that Dr. Stanford was acting both ‘in the business of’ and ‘under the direction of’ CVSA, the evidence simply does not support the conclusion that his work — however narrowly defined — was of primary benefit to CVSA.” The majority supports this illogical proposition by asserting that a substantial benefit flowed to the government because Dr. Stanford sought the fellowship with CVSA “in order to improve his surgical skills,” and that “it is highly unlikely that the Air Force would have agreed to this arrangement had it not felt it would benefit from it.” Because “Dr. Stanford’s fellowship suited the government’s needs,” of allowing Dr. Stanford to “hide out” and “was intended to benefit the government and Dr. Stanford more than CVSA,” the majority contends that both the short term and long term advantages of the fellowship flowed to the government. However, the majority’s assumption is sheer speculation, not based on the record, and in adopting this analysis the majority implicitly applies a legal theory which I have previously pointed out was expressly rejected by the Wisconsin Supreme Court less than two years ago. In DePratt v. Sergio, 102 Wis.2d 141, 306 N.W.2d 62 (1981), the Wisconsin Supreme Court declined the opportunity to adopt a “dual liability approach” as an alternative to the borrowed servant rule. The “dual liability approach” would have allowed a plaintiff who is injured by a borrowed servant to recover from both the general employer as well as the special employer. In analyzing and rejecting the dual liability approach, the Wisconsin Supreme Court stated:
“Under the dual liability approach, which the plaintiff urges us to adopt, both the borrowing employer and the loaning employer may be held liable in tort to a *1172 third party who sustains injuries caused by the negligence of the loaned employee when the loaning employer retains broad control over the loaned employee (such as the right to discharge the employee) and the borrowing employer has control over the details-of the loaned employee’s work. ******
Under the entrepreneur or enterprise theory of liability both employers should be responsible to the injured party because both exercise a degree of control, both profit from the employee's conduct, and both are capable of planning for and transferring the losses incurred.
We conclude, however, that the dual liability approach, although having some merit, does not offer a simple and easily applicable alternative to the borrowed servant rule, and we decline to substitute it for the present rule.”
Id. at 144-46, 306 N.W.2d 62.
As set forth in DePratt, Dr. Stanford, the special employee, was under the exclusive control of CVSA for the purposes of the Green operation while under only the broad control of the United States Air Force at that time. It is clear that under the doctrine of respondeat superior CVSA was liable to the plaintiff for the malpractice of any of its employees proven to be negligent. Indeed, CVSA entered into a settlement with the plaintiff and in exchange for a sum certain ($574,999.00) the plaintiff agreed to release CVSA from all liability for the negligence of its employees during Mrs. Green’s operation. The plaintiff did, however, expressly reserve the right to assert liability against both Dr. William Stanford, individually, and also against the United States Government. Thereafter, the plaintiff sued Dr. Stanford as well as the United States Government, alleging that the government was Dr. Stanford’s employer and therefore it should be held responsible for Dr. Stanford’s negligence. The plaintiff ignored the fact that since Dr. Stanford was a “special employee” of the special employer (CVSA), any negligence attributed to him must be imputed directly to CVSA and not the government and thus Dr. Stanford’s negligence should properly have been included in the settlement CVSA made with the plaintiff. As CVSA has already compensated the plaintiff for the negligence of its employees, by also holding the government separately liable for Dr. Stanford’s actions the trial court and the majority opinion of this court implicitly adopt the “dual liability” theory previously rejected by the Wisconsin Supreme Court and allow the plaintiff to recover from both the special employer (CVSA) and the general employer (the government) for a “borrowed servant’s” negligence.
The plaintiff argued and the trial court agreed that the government could not escape liability under Wisconsin’s Borrowed Servant Doctrine, because in its motion to dismiss Dr. Stanford, the government conceded that Dr. Stanford was acting “within the scope of his duties” as a military physician. I disagree and join with the majority’s holding that “Wisconsin law appears to support the government’s argument that nothing precludes it from claiming Dr. Stanford was acting within the scope of his general employment at the same time he was the Borrowed Servant of a Special Employer.” The plaintiff misconstrued the government’s limited admission that Dr. Stanford was acting within the scope of his duties as a military physician as this admission only goes so far as to invoke “the state law of respondeat superior with respect to tort claims arising out of the alleged wrongful acts of military personnel.” Bissell v. McElligott, 369 F.2d 115, 117 (8th Cir.1966).
An example of military personnel “acting in the scope of their duties” and “loaned” to a special employer is clearly demonstrated in the events surrounding the recent air traffic controllers strike. During the PAT-CO employees’ wildcat strike, Army Air Force and Navy Air Force air traffic controllers were assigned by the military to work at civilian airports and were on full active duty while receiving their full military pay from the government. The only monetary benefit these military personnel *1173 civilian airport “special employers” was a per diem stipend, and likewise, while Dr. Stanford was in Milwaukee, the only monetary benefit he received from CVSA was a housing allowance. Because these air traffic controllers were ordered by their commanding officers to replace the striking workers, clearly they were acting as military personnel on active duty and were acting “within the scope of their duties.” Similarly, Dr. Stanford was on active duty and “within the scope of his duties” when he was assigned to work with CVSA. At the time the military air traffic controllers undertook their assignments in Wisconsin, they became the special employees of their civilian “special employers,” as was Dr. Stanford a special employee of CVSA.
The plaintiff further contends that since the Medical Malpractice Immunity Act, 10 U.S.C. § 1089, immunizes Dr. Stanford from a suit arising out of Mrs. Green’s operation, if the government is able to escape liability by the application of the Borrowed Servant Doctrine, the plaintiff will be left without a remedy. Contrary to the plaintiff’s argument, the plaintiff herein was not “without a remedy” at the outset of this lawsuit even though Dr. Stanford has been immunized from suit by the Medical Malpractice Immunity Act and the government also avoids liability under Wisconsin’s Borrowed Servant Doctrine. Wisconsin’s Borrowed Servant Doctrine simply transfers the liability for Dr. Stanford’s negligence to CVSA. Thus, the proper application of Wisconsin’s Borrowed Servant Doctrine mandates that Dr. Stanford’s negligence cannot be imputed to the government, but rather should have been included in CVSA’s settlement with the plaintiff.
In dissenting from the holding of the majority of this panel I am aware of the serious nature and extent of the injuries sustained by Mrs. Green as a result of the tragic events which occurred during and after her heart by-pass operation. Moreover, I do not condone the actions of the Air Force and firmly believe that Dr. Stanford’s superiors had a moral and ethical obligation to advise CVSA concerning Dr. Stanford’s questionable surgical skills as well as his high mortality rate, his difficulties at the Air Force base and the personal problems he encountered with other Air Force medical personnel. I also feel that it was disgraceful for the Air Force to attempt to rid itself of a “hot potato” by unloading its “problem child” on CVSA. However, I hold that it is not the province of this court to cast adrift Wisconsin’s law, as eloquently set forth by Wisconsin’s Supreme Court as recently as DePratt (1981), and further, in the absence of a constitutional question, federal courts should not attempt to revolutionize state law by ignoring legal reasoning and settled case law merely to reach a result I also would like to reach in equity, that of adequately compensating Mrs. Green. Therefore, in light of the fact that federal courts are bound to apply the law of the state, because Dr. Stanford consented to work for CVSA, was performing CVSA’s surgical procedure at the specific time of the inquiry (i.e., Mrs. Green’s operation), and as CVSA (through Dr. Mullen) had the duty and obligation to control and supervise each and every detail of the heart by-pass procedure from preparation through post-surgical care, and since CVSA received the primary benefit from Mrs. Green’s specific operation, I would reverse the district court and hold that the United States government is not liable for Dr. Stanford’s alleged malpractice under Wisconsin’s Borrowed Servant Doctrine.