Randy GANSCH, Plaintiff-Respondent,

v.

NEKOOSA PAPERS, INC., a Wisconsin corporation, and Sentry Insurance, a mutual company, a Wisconsin insurance corporation, Defendant-Appellants. †

Court of Appeals

*No. 88-1190. Orally argued May 26, 1989—Decided October 19, 1989.*

(Also reported in 449 N.W.2d 307.)

† Petition to review granted.

668

 █

For the defendants-appellants the cause was orally argued and submitted on the briefs of *Russell T. Golla* of *Anderson, Shannon, O'Brien, Rice & Bertz* of Stevens Point.

For the plaintiff-respondent the cause was orally argued and submitted on the brief of *Jerome A. Maeder* of *Jerome A. Maeder, S.C.,* of Wausau.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. Nekoosa Papers, Inc., and Sentry Insurance appeal from a judgment awarding Randy Gansch $95,649.32 in damages for injuries he sustained while performing services for Nekoosa. The issues are: (1) whether, at the time of his injury, Gansch was Nekoosa's "loaned employee," and thus subject to the exclusive remedy provisions of the Worker's Compensation Act, ch. 102, Stats.;[1] and (2) whether the jury's award of damages should be overturned as excessive. We resolve both issues against Nekoosa and affirm the judgment.

Gansch was employed by Midway Transport Corporation, a wholly owned subsidiary of Bassuener Construction, Inc. Bassuener and Nekoosa entered into a

---

[1] We obviously disagree with the dissent's formulation of the issue as "whether Gansch is subject to sec. 102.29(6), Stats.," which deals with employees of "temporary help" agencies. Neither party even refers to that statute, much less argues that it applies—or does not apply—to this case.

669

contract whereby Bassuener agreed to lease a bulldozer to Nekoosa—along with an operator (Gansch)—for work in Nekoosa's lime pit while Nekoosa's own bulldozer was being repaired.

At the time of the accident, Gansch had been working at the Nekoosa lime pit for ten days. Generally, Nekoosa's foreman would instruct Gansch at the beginning of the workday whether to pile or disk the lime and, if piled, where to place the piles. Two or three times a day, Darrel Bassuener, the owner of Bassuener Construction, would drive to the lime pit to make sure that Gansch was not "sloughing off." Midway Transport continued to pay Gansch's wages and handle his withholding, and social security tax deductions, and only Bassuener could fire him.

On the tenth day, Nekoosa's bulldozer was returned to the job site after being repaired. Gansch left his machine to assist in the unloading of the bulldozer and was injured when the bulldozer blade fell on his foot.

Gansch sued Nekoosa for damages and the case was tried to a jury. At the close of the evidence, both parties moved the court to direct a verdict on the issue of whether Gansch was a loaned employee. The court granted Gansch's motion, holding that, as a matter of law, he was not a loaned employee of Nekoosa and thus his action was not barred by the exclusive remedy provisions of the Worker's Compensation Act. The jury found both Gansch and Nekoosa negligent and apportioned sixty-eight percent of the negligence to Nekoosa's employees and thirty-two percent to Gansch. Damages were set at $95,649.32—$79,200 for past and future pain, suffering and disabilities, $13,000 for past wage loss, and $3,449.32 for medical and hospital expenses. The trial court denied Nekoosa's postverdict motions and entered

judgment on the verdict. Other facts will be discussed below.

## I. THE "LOANED EMPLOYEE" ISSUE

The trial court's ruling that at the time of the accident Gansch was not Nekoosa's loaned employee involves the application of a legal standard to found facts, a question of law which we decide without deference to the trial court's decision. *Matter of Mental Condition of W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142, 143 (Ct. App. 1987).

The court's ruling was based solely on the provisions of the written contract between Bassuener and Nekoosa, which stated that Gansch would remain Bassuener's employee at all times. This was error. While the terms of the agreement between the employers constitute "important . . . evidence" of the employee's status, they are not controlling. *Hanz v. Industrial Comm.*, 7 Wis. 2d 314, 318, 96 N.W.2d 533, 535 (1959), quoting *Schmidlkofer v. Industrial Comm.*, 265 Wis. 535, 539, 61 N.W.2d 862, 865 (1953). Courts must "not only . . . consider . . . the writings which attempt to define the status of the parties, but also all of the surrounding circumstances in order correctly to ascertain the exact relation which has resulted from the dealings between the parties." *Hanz*, 7 Wis. 2d at 317-18, 61 N.W.2d at 535, quoting *Montello Granite Co. v. Industrial Comm.*, 227 Wis. 170, 183, 278 N.W. 391, 397 (1938).

We analyze the circumstances of the employment by considering the following factors:

> (1) Did the employee actually or impliedly consent to work for the special employer?

(2) Was the employee performing the special employer's work at the time of the injury?

(3) Did the special employer have the right to control the details of the work being performed?

(4) Was the work of the employee primarily for the benefit of the special employer? *Meka v. Falk Corp.,* 102 Wis. 2d 148, 151, 306 N.W.2d 65, 68 (1981)

### (a) *Consent*

The first factor is considered the most important—whether the employee actually or impliedly consented to work for the special employer. *Ryan, Inc. v. ILHR Department,* 39 Wis. 2d 646, 650, 159 N.W.2d 594, 595 (1968). An employee simply cannot be transferred to a special employer without his consent. *Skornia v. Highway Pavers, Inc.,* 39 Wis. 2d 293, 298, 159 N.W.2d 76, 79 (1968).

Nekoosa, contending that Gansch impliedly consented to work for Nekoosa as a loaned employee, emphasizes that during his ten days on the Nekoosa job, he worked the same hours as the other Nekoosa employees and followed the directions of the Nekoosa foreman.

We start with the presumption that the original employment relationship remains. *Skornia,* 39 Wis. 2d at 300, 159 N.W.2d at 80. That presumption may only be overcome by a "clear demonstration that a new temporary employer has been substituted for the old . . .." 1C A. Larson, *Workmen's Compensation Law,* sec. 48.14 (1986) (footnote omitted).

In *Skornia,* 39 Wis. 2d at 299–300, 159 N.W.2d at 80, the supreme court adopted the rules stated in

Restatement (Second) of Agency, sec. 227 comments b and c (1958), relating to loaned employees:

> b. *Inference that original service continues.* In the absence of evidence to the contrary, there is an inference that the actor remains in [the general employer's] employment so long as, by the service rendered another, he [or she] is performing the business entrusted to him [or her] by the general employer. There is no inference that because the general employer has permitted a division of control, he [or she] has surrendered it.
>
> c. *Factors to be considered.* . . . Thus a continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

Applying these rules to the facts of this case, we first note that Gansch was on the job for Nekoosa for only ten days.[2] Darrel Bassuener testified that he only intended to keep Gansch on the Nekoosa job until one of his other operators became free to work the job. In addition, Vern Nelson, Nekoosa's foreman, acknowledged that Gansch was a "fine" employee and that his job required skill and training. We have no doubt that a bulldozer operator is a "specialist" within the meaning of the *Restatement* rule. All of these factors support the conclusion that Gansch had not given his implied consent to work for Nekoosa.

---

[2]Other cases where the court has found that the employees gave implied consent to work for the special employers, the employees were on the job for a period of three and four months respectively. *See Meka,* 102 Wis. 2d at 151, 306 N.W.2d at 67; *Freeman v. Krause Milling Co.,* 43 Wis. 2d 392, 396, 168 N.W.2d 599, 601 (1969).

While it is true that Nekoosa's foreman gave Gansch general directions as to the placement of lime piles and similar matters, the mere fact that an employee submits himself to the control and direction of the special or temporary employer is not conclusive on the issue of whether the employee consented to work for the special employer. Where the original employer directs the employee to perform services for the special employer, the special employer's right to direct the work, standing alone, is insufficient to support an inference of implied consent. *Meka,* 102 Wis. 2d at 155 n. 10, 306 N.W.2d at 69–70. Bassuener testified that he told Gansch to do whatever project Nekoosa asked him to do. By taking orders from Nekoosa's foreman, Gansch was only doing as Bassuener had instructed him.

Gansch's testimony also indicates that in his own mind he considered himself to be Bassuener's employee:

> Q: When you went to Nekoosa, in your mind and in your perception, who were you working for?
> A: Darrel Bassuener.
> Q: Did anybody ever suggest you were working for Nekoosa, that they were you[r] employer or anything else?
> A: No.
> . . ..
> Q: Who told you where to go on what job?
> A: Darrel Bassuener.
> Q: So that in your understanding as a man who has worked for alot of contractors, at the time of this accident, who were you working for?
> A: Darrel Bassuener.

We conclude that Gansch did not consent to become Nekoosa's employee.

### (b) *Nekoosa's Work*

There is no question that Gansch's work in Nekoosa's lime pit and his assistance in unloading the bulldozer was work being done for Nekoosa.

### (c) *Right to Control the Details*

Relying on *Huckstorf v. Vince L. Schneider Enterprises,* 41 Wis. 2d 45, 163 N.W.2d 190 (1968), Nekoosa contends that it had the right to control the details of Gansch's work because Gansch disked and piled lime at the direction of Nekoosa's foreman. In *Huckstorf,* the employee, a crane operator who relied on extensive hand signals by other employees of the special employer to determine what specific objects to pick up and where to place them, was held to be a loaned employee. *Id.,* 41 Wis. 2d at 48, 54, 163 N.W.2d at 192, 195.

We do not believe Gansch's situation can be likened to that of a crane operator, whose almost every move is directed by the special employer, either orally or through hand signals. We believe it to be more akin to the so-called "carriage cases," such as those described in *Nepstad v. Lambert,* 50 N.W.2d 614, 622 and n. 17 (Minn. 1951). There, the Minnesota court explained the concept of "control" in loaned employee cases by distinguishing between: (1) "[t]he line of cases known as the 'carriage cases' . . . where a person hires an automobile and driver and merely designates the destination he [or she] wishes to reach, the route to be taken, or even the approximate speed he [or she] wishes to travel"; and (2) cases where the employer has "detailed control over the driver and . . . the right to tell him [or her] how to drive . . .." In the former situation, the driver does not become the special employer's employee, and in the latter he or she does. *Id.*

Professor Larson makes the same point:

> [T]he right to control the end result as distinguished from the method of arriving at it falls short of showing employment. Thus, the borrower of a truck and driver can specify the cargo, destination and route without thereby being deemed to assume control over the work. Larson, *supra,* sec. 48.30, at 8-500 [footnotes omitted].

At trial, both Gansch and Nekoosa's foreman testified that the foreman only gave Gansch general directions at the start of each day. Gansch was in charge of all of the details of his work and the operation of his machine. He was not dependent on more specific instructions. Nor was he acting under anyone's directions at the time of his injury. He decided on his own to help Nekoosa's employees unload the bulldozer. Nekoosa's general directions to Gansch cannot be said to constitute "detailed control" over the specifics of his work.

### (d) *Whose Benefit?*

Nekoosa argues that Gansch's disking and piling of lime was for its benefit, not Bassuener's. However, in cases where the original employer leases a piece of equipment with an operator, the supreme court has recognized that the original employer receives a benefit from the services rendered by the operator because it not only gains financially from the lease but also reaps the benefit of having its property entrusted to an operator it has selected.

> A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to

676

operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his [or her] interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer . . .. *Skornia,* 39 Wis. 2d at 300, 159 N.W.2d at 80, quoting Restatement (Second) of Agency, sec. 227 comment c (1958).

Bassuener testified that the piece of equipment leased to Nekoosa was worth about $80,000 and that he relied on Gansch to operate it in a sensible manner. He also stated that he charged Nekoosa an hourly rate of $65 and that he received a total of $6,020 for the project. Bassuener's benefit from the Nekoosa project and Gansch's work is apparent.

Considering all these factors and the terms of the contract between Bassuener and Nekoosa, we are satisfied that Gansch was not a loaned employee at the time he was injured.

## II. DAMAGES

The amount of damages is for the jury to decide, and where the trial court has approved a damage award over a claim of excessiveness, the issue on appeal is whether there is any credible evidence that under any reasonable view supports the verdict and removes the issue from the realm of conjecture. *White v. General Cas. Co. of Wisconsin,* 118 Wis. 2d 433, 440, 348 N.W.2d 614, 618 (Ct. App. 1984). To reverse, we must be able to conclude that there is such a complete absence of proof that the verdict is based on speculation. *Id.*

677

At the hearing on motions after verdict, the trial court stated as follows in rejecting Nekoosa's claim of excessiveness:

> I can safely say that I think this $79,200 is a high verdict, quite high, but does not shock the conscience of the Court.
>
> This man has 48 years to live. He has got a foot that is not going to work properly after more than six or so hours of work a day. . . . When the temperature reaches 32 degrees Fahrenheit, he has problems with that foot. . . . There is permanent pain and discomfort.

In addition, the record indicates that Gansch's foot was crushed by the bulldozer blade. There was medical evidence of bone breakage, the permanency of injury, and the attendant pain and discomfort. Portions of the bones in Gansch's foot were surgically removed, and there was evidence that he would continue to experience discomfort and a severe intolerance of cold in his foot, and that his injuries interfere with his ability to continue working in the construction industry and his enjoyment of outdoor activities in general.

Given that evidence and the trial court's evaluation and approval of the verdict, we conclude that Nekoosa has not met its burden of establishing that the damages were excessive.

*By the Court.*—Judgment affirmed.

SUNDBY, J. (*dissenting*). This appeal presents an important question of third-party liability under sec. 102.29(1), Stats., of the Worker's Compensation Act. The question is whether Gansch is subject to sec. 102.29(6) and may not maintain an action in tort against

Nekoosa Papers for his injuries.[1]

## I.

Section 102.29(6), Stats., provides:

> No employe of a temporary help agency who makes a claim for compensation may make a claim or maintain an action in tort against *any* employer who compensates the temporary help agency for the employe's services. [Emphasis added.]

This statute does not apply only to Manpower-type agencies. Section 102.01(2)(f), Stats., provides that " '[t]emporary help agency' means an employer who places its employe with another employer who controls the employe's work activities and compensates the first employer for the employe's services." For a discussion of worker's compensation acts as applied to temporary help agencies, see 1C A. Larson, *The Law of Workmen's Compensation,* sec. 48.23, at 8–484.

The Legislative Reference Bureau questioned the Worker's Compensation Advisory Council's request for the above definition as follows: "Note that the language as requested does not define a temporary help agency as an employer who is 'in the business of' placing employes with other employers. As such, it may be too broad." Limprecht Memorandum, October 15, 1981, Legislative

---

[1]Nekoosa Papers states that one of the issues before the court is whether the trial court erred in failing to adopt a labor-broker exception to the loaned employee rule. We cannot resolve that issue without determining the application of sec. 102.29(6), Stats. The majority states that neither party cites sec. 102.29(6). Maj. op. at 669. There is no rule of appellate procedure that justifies ignoring an issue clearly raised by a party and dispositive of the appeal simply because a party has overlooked an applicable statute or decision.

Reference Bureau Drafting Record, ch. 92, Laws of 1981. The legislature nonetheless adopted the requested definition of "temporary help agency." We must therefore give the term broad construction.

## II.

Bassuener[2] is a "temporary help agency." It is an independent contractor engaged in the business of renting heavy equipment to Nekoosa Papers. It has been so engaged for a number of years. Its rental agreement was an "annual agreement," which was drafted by Nekoosa Papers. Bassuener (1) placed its employee, Gansch, (2) with another employer, Nekoosa Papers, (3) who controlled Gansch's work activities, and (4) who compensated Bassuener for Gansch's services. The definitional elements of sec. 102.01(2)(f), Stats., are thus present.

*(1) Placing its employee.* When Nekoosa Papers wished to rent an item of heavy equipment from Bassuener, it issued to Bassuener a purchase order. Paragraph 7(c) of the purchase order provides that Bassuener shall:

> Retain under his direct supervision and control all persons and *employees furnished by him* for the work contemplated to be done under this purchase order. Such employee shall be, and shall remain at all times, employees of [Bassuener]. [Emphasis added.]

Gansch concedes that, under the contract and purchase order, he was a "loaned" employee, in the same sense that Bassuener's equipment was "loaned." There-

---

[2]Gansch was employed by Midway Transport Company, Inc., which is wholly owned by Bassuener Construction Company, Inc. In this opinion Bassuener refers to both entities.

fore, it is not subject to serious dispute that Bassuener "placed" Gansch with Nekoosa Papers.

*(2) Another Employer.* Nekoosa Papers is another employer as defined in sec. 102.04(1)(b)1., Stats. For purposes of sec. 102.01(2)(f), it is not necessary that Nekoosa Papers qualify as a "special employer" under the four-part test consistently applied by the Wisconsin courts. *See Meka v. Falk Corp.,* 102 Wis. 2d 148, 151, 306 N.W.2d 65, 68 (1981). Section 102.29(6) was intended to eliminate the "loaned" employee requirement as a condition of immunity from third-party tort liability.

*(3) Control of the Employee's Work Activities.* When the legislature acts in an area where the courts have been active, the legislation can be construed as codifying the decisions or changing the decisional result. In view of the dissatisfaction expressed by the Wisconsin Supreme Court with the "loaned employee" rule, it would be illogical to conclude that the legislature intended to put its imprimatur on that rule. In *Freeman v. Krause Milling Co.,* 43 Wis. 2d 392, 394 n. 2, 168 N.W.2d 599, 600 (1969), the court said: "The court has given some thought to a revision of the rule but has determined to hold to its precedents until persuaded a change is justified." In *DePratt v. Sergio,* 102 Wis. 2d 141, 146, 306 N.W.2d 62, 65 (1981), the court conceded that "the traditional borrowed servant rule has deficiencies in theory and in application." In *Meka,* the court refused to hold that as a matter of law in labor-broker cases the loaned employee becomes the employee of the labor-broker's customer. The court said, however:

> We do not adopt such a rule although we recognize that the tests this court has adopted to determine when the borrowing employer becomes a special

employer "when applied to specific factual situations" result in distinctions which "are sometimes slight" and in decisions which are "well-nigh irreconcilable." [*Freeman* at 394, 168 N.W.2d at 600.] *See* 1C [Larson], *The Law of Workmen's Compensation* sec. 48.23 (1980).

102 Wis. 2d at 158 n. 13, 306 N.W.2d at 71.

It is not coincidental that, after the decision in *Meka,* the Worker's Compensation Advisory Council recommended legislative changes that would relieve employers of "placed" employees from third-party tort liability. Meka was employed by a business which provided temporary help to other companies. *Meka* was decided June 2, 1981. The memo outlining the Worker's Compensation Advisory Council's request for a legislative change as to temporary help agencies was dated October 15, 1981. Legislative Reference Bureau Drafting Record, ch. 92, Laws of 1981. On December 2, 1981, the chairperson of the Worker's Compensation Advisory Council forwarded to the members of the council copies of *Meka* which, she advised, involved the subject matter of a "part of the amendments." Worker's Compensation Advisory Council's 1981 Records.

I conclude that the legislature intended to eliminate *Meka's* four-part test to determine whether an employee of a temporary help agency working temporarily for another employer may maintain a third-party tort action against the temporary employer.[3] The "control" factor of the four-part test is not therefore applicable to temporary help agency employment. The temporary employer's control of the temporary employee's work

[3]The *Meka* test or rule may continue to be applied to determine liability for worker's compensation or liability for the negligent act of the employee. The validity of the test or rule as applied to those situations is not involved in this case.

activities need not be so detailed as to make the employee a "loaned" employee. The control contemplated by sec. 102.01(2)(f), Stats., is that typically exercised by a temporary employer over a temporary help agency employee. Larson says that "[e]mployers obtaining workers from the kind of labor service typified by Manpower, Inc., have usually, but not invariably, been held to assume the status of special employer." 1C A. Larson, *supra,* sec. 48.23, at 8-488-489 (footnote omitted). Larson cites *Simmons v. Atlas Vac Mach. Co.,* 493 F. Supp. 1082 (E.D. Wis. 1980) where the court, applying Wisconsin law, held that an employee of an employer engaged in the business of providing temporary help to various businesses and factories was a "special" or "loaned" employee of the business where she was placed. *Id.*

Even under *Meka's* four-part test, Nekoosa Papers exercised such control over Gansch's work activities as to make him a "loaned" employee of Nekoosa Papers. Certainly it controlled Gansch's work activities to the degree necessary to fulfill the "control" criterion of sec. 102.01(2)(f), Stats.

Bassuener had annual agreements with Nekoosa Papers for many years pursuant to which it provided heavy equipment and operators. Bassuener hired Gansch with the expectation of having him perform services for Nekoosa Papers. The contract in effect when Gansch was injured was dated February 7, 1986. Nekoosa Papers issued a purchase order to Bassuener to rent a bulldozer and operator from June 7 through June 21, while its caterpillar tractor was being repaired. Gansch was injured on June 20.

Gansch's job was to disk and pile lime in Nekoosa Paper's lime storage area. Gansch reported each morning to Nekoosa Paper's lead man who instructed him as to

his work activities during the day. Gansch described Nekoosa Paper's lead man as his supervisor. Bassuener did not supervise Gansch although Darrel Bassuener, the sole owner of both Bassuener and Midway Transport, drove through the area two or three times a day to see if Gansch was "sloughing off." Darrel Bassuener testified that he believed it was up to Nekoosa Papers' foreman or superintendent to tell Gansch what he should do, when he should do it and how he should do it. He acknowledged that the disking and piling of the lime was Nekoosa Papers' work and for its benefit.

Gansch followed the same routine of reporting to work, taking lunch breaks and other breaks, and leaving work as did Nekoosa Papers' regular employees.

Bassuener paid Gansch's wages, and his social security and withholding taxes. Bassuener had the right to discipline or fire Gansch or reassign him to another work place. Gansch considered himself Bassuener's employee. Bassuener's insurance carrier paid Gansch's worker's compensation benefits. The employment relationship between Gansch and Nekoosa Papers was typical of a temporary help agency employment relationship. The degree of control exercised by Nekoosa Papers was therefore sufficient to satisfy the "control" criterion of sec. 102.01(2)(f), Stats.

It is true that Larson says that "[t]he factor that seems to play the largest part in lent-employee cases is that of furnishing heavy equipment." 1C A. Larson, *supra,* sec. 48.30, at 8–505. He states that the majority of the decisions have been influenced by the arguments that the general employer would naturally reserve the control necessary to insure that the general employer's equipment is properly used, and that a substantial part of the operator's duties would consist of the continuing duty of maintenance of the equipment. *Id.* at 8–510.

The decisions attaching significance to the furnishing of heavy equipment were not decided under statutes limiting the "loaned" employee's right to maintain a third-party tort action against the special employer. Even if the rationale of these cases is applied, they do not justify the conclusion that Gansch was a "loaned" employee. Gansch was not in charge of maintaining any of the equipment that Bassuener supplied. All he was required to do was follow the normal practice of checking the water, oil and fuel on a daily basis.

Most important, however, is the fact that when Gansch was injured, he had abandoned the bulldozer supplied by Bassuener and was assisting Nekoosa Papers' employees in getting Nekoosa Papers' caterpillar into operation. "[W]hen the lent employee becomes separated from the lent equipment with which he was identified, this may sever his contract with the general employer." 1C A. Larson, *supra,* sec. 48.24, at 8–495. Larson cites a Pennsylvania case, *Ramondo v. Ramondo,* 82 A.2d 40 (Pa. Super. Ct. 1951), which held that when the lent-employee was injured using the special employer's equipment and not that furnished by the employer, the special employer was solely liable for worker's compensation benefits.

A new test as to control will have to be developed in applying sec. 102.29(6), Stats. Greater weight must be given to whose work is being done. Even in the "loaned" employee situation, whose work is being done is accorded an almost presumptive weight. Larson says that "[i]f it is possible to say, in a particular case, that the job being accomplished was of interest only to the special employer, the chances are good that the lent-employee doctrine will be applied." 1C A. Larson, *supra,* sec. 48.21, at 8–449. It is only common sense that when an employer uses its own employees, whether perma-

nent, temporary, loaned, or placed, the employer will wish to control the work activities of its employees so that the work is done to the employer's satisfaction.

In this case, it is undisputed that at the time of the accident, Gansch was doing Nekoosa Papers' work.

For these reasons, I conclude that at the time of Gansch's injury, Nekoosa Papers was the employer who controlled Gansch's work activities, within the meaning of sec. 102.01(2)(f), Stats.

*(4) Compensation.* It is undisputed that Nekoosa Papers compensated Bassuener for Gansch's services. Bassuener charged Nekoosa Papers an hourly rate which included the cost of an operator.

*(5) Summary.* All of the elements of sec. 102.01(2)(f), Stats., are satisfied. Bassuener was therefore an employer who placed its employee, Gansch, with another employer, Nekoosa Papers, who controlled Gansch's work activities and compensated Bassuener for Gansch's services. Because Gansch made a claim for worker's compensation, sec. 102.29(6) prevents him from maintaining a third-party action in tort against Nekoosa Papers.[4]

### III.

Limiting the temporary employee to his or her remedy under the worker's compensation act is consistent with the philosophy and purpose of the act. "Worker's compensation laws are basically economic regulations by which the legislature, as a matter of public policy, has balanced competing societal interest." *Mulder v. Acme-*

---

[4]An employee cannot avoid the exclusive remedy effect of sec. 102.03(2), Stats., by not making a claim under the act. Section 102.03(2) applies where the conditions of liability exist.

*Cleveland Corp.,* 95 Wis. 2d 173, 180, 290 N.W.2d 276, 280 (1980).

The *Mulder* court quoted the following from *Coleman v. American Universal Ins. Co.,* 86 Wis. 2d 615, 621, 273 N.W.2d 220, 222 (1979):

> It is boilerplate law in Wisconsin that the rationale underlying statutory worker's compensation is that workers accept smaller recoveries than those potentially available at common law in return for coverage of all work-related injuries regardless of fault. [Citations omitted.] Instead of damages, the statutory compensation scheme provides an injured employee with medical care and income maintenance, the latter being figured as the percentage of preinjury income.

*Mulder,* 95 Wis. 2d at 180–81, 290 N.W.2d at 280. As to this, the *Mulder* court stated that "[t]he exclusive-remedy provision, sec. 102.03(2), Stats., is an integral feature of the compromise between the interest of the employer and the interest of the worker." *Id.* at 181, 290 N.W.2d at 280. "The principle of exclusivity is firmly entrenched in Wisconsin law." *Coleman,* 86 Wis. 2d at 621, 270 N.W.2d at 222.

The *Mulder* court further said:

> It is clear that this court's interpretation, which outlaws any contribution by the employer or which immunizes an employer from otherwise recognized common law suits *where the underlying injury was work connected,* is not the result of a superimposed judicial gloss but, rather, reflects the explicitly stated legislative intent. [Emphasis added.]

95 Wis. 2d at 182, 290 N.W.2d at 280–81.

It has been held that the *quid pro quo* of the worker's compensation act is not satisfied if the third-

party employer has no exposure to worker's compensation liability. In *Candler v. Hardware Dealers Mut. Ins. Co.,* 57 Wis. 2d 85, 91, 203 N.W.2d 659, 662 (1973), the court said that, "[g]enerally a '3rd party,' against whom an action is authorized under the workmen's compensation law, is a person on whom no liability could be entailed under the Act."[5]

For decades, Larson has been saying that immunity follows compensation responsibility. 2A A. Larson, *supra,* sec. 72.33, at 14–228.6. I believe that where the new temporary help relationship exists, the temporary employer is primarily responsible for worker's compensation. The temporary employer's liability is at least contingent under sec. 102.06, Stats.[6] I conclude that con-

---

[5]In a recent decision, *Henning v. General Motors Assembly,* 143 Wis. 2d 1, 419 N.W.2d 551 (1988), the Wisconsin Supreme Court relied on the employer's exposure to worker's compensation liability and the employee's right to the recovery of worker's compensation to limit the right of that employee to maintain a tort action against his employer.

[6]Section 102.06, Stats., provides:

An employer shall be liable for compensation to an employe of a contractor or subcontractor under the employer who is not subject to this chapter, or who has not complied with the conditions of s. 102.28(2) in any case where such employer would have been liable for compensation if such employe had been working directly for the employer, including also work in the erection, alteration, repair or demolition of improvements or of fixtures upon premises of such employer which are used or to be used in the operations of such employer. The contractor or subcontractor (if subject to this chapter) shall also be liable for such compensation, but the employe shall not recover compensation for the same injury from more than one party. In the same manner, under the same conditions, and with like right of recovery, as in the case of an employe of a contractor or subcontractor, described above, an employer shall also be liable for compensation to an employe who has been loaned by the employer to another employer. The employer who becomes liable for and pays such compensation may recover the same from such contractor, sub-

tingent responsibility is sufficient to invoke immunity from tort liability.[7] Larson approves the result in *Washington Metro. Transit Auth. v. Johnson,* 467 U.S. 925, *reh'g denied,* 468 U.S. 1226 (1984), where the Court held that a general contractor whose subcontractors were also insured was entitled to immunity from tort liability in an action by a subcontractor's employees. 2A A. Larson, *supra,* sec. 72.31(b), at 14–177. "The two key points established by this decision are, first, that the contingent liability of the general contractor is sufficient to entitle it to immunity, and, second, that both the general contractor and the insured subcontractor are immune to tort suit, the former in its role as statutory employer and the latter in its role as direct employer." *Id.*

In *Washington Metro,* the Court said that the language of the exclusive remedy statute "does not effortlessly embrace contractors." 467 U.S. at 933. Likewise, the language of sec. 102.06, Stats., does not effortlessly prescribe contingent liability for special or temporary employers. The Wisconsin Supreme Court has held that sec. 102.03(2) does not preclude an action by an injured employee against the defendant unless the defendant is liable under the act to pay compensation to the

---

contractor or other employer for whom the employe was working at the time of the injury if such contractor, subcontractor or other employer was an employer as defined in s. 102.04.

[7] It is not necessary, therefore, to decide whether the legislature could base immunity solely upon the employee's right to worker's compensation. However, even if the temporary employer is not primarily or secondarily liable for worker's compensation, the cost of worker's compensation liability coverage will be passed on to the temporary employer in the compensation it will pay the temporary help agency. This involvement of the temporary employer in the providing of worker's compensation is sufficient to immunize the employer from third-party tort liability.

employee. *Cermak v. Milwaukee Air Power Pump Co.,* 192 Wis. 44, 211 N.W. 354 (1927); *Culbertson v. Kieckhefer Container Co.,* 197 Wis. 349, 222 N.W. 249 (1928).

*Cermak* and *Culbertson* may not survive review by the supreme court. *See Wagner v. Continental Cas. Co.,* 143 Wis. 2d 379, 387, 421 N.W.2d 835, 838 (1988); *but see id.* at 406, 421 N.W.2d at 846 (Abrahamson, J., dissenting). If not, presumably the view of the dissent in *Cermak* will prevail. *See Cermak,* 192 Wis. at 50, 211 N.W. at 357 (Rosenberry, J., dissenting). Justice Rosenberry stated that because the defendant was an employer under the act and was potentially liable under the act for compensation to its contractor's employee, it was not a third party under sec. 102.29(1), Stats.

Justice Rosenberry's view seems sound, given the *quid pro quo* philosophy of the worker's compensation act. An employer which has insured against its compensation liability by complying with sec. 102.28(2)(a), Stats., will be very surprised to learn that that protection is illusory if a loaned employee is injured while in its employ.

The United States Supreme Court in *Washington Metro* said that in choosing between conflicting interpretations of the immunity provision of the act, "we are predisposed in favor of the majority view that tort immunity should extend to contractors. This position is presumptively the better view because it is more consistent with the compromise underlying the [act]. The reward for securing compensation and assuming strict liability for worker-related injuries has traditionally been immunity from tort liability." 467 U.S. at 934.

The holding of the Wisconsin Supreme Court in *Culbertson* is termed by Larson as "extreme." 2A A. Larson, *supra,* sec. 72.31(c), at 14-183-84. "The usual rationale of this extraordinary holding is that the general

contractor does not in any sense become the 'employer'; he is rather an insurer of the subcontractor's compensation obligation. This looks like a case of preoccupation with labels at the expense of substance. The general contractor, like the immediate employer, is subjected to nonfault liability for compensation, whether he is called a statutory employer, or insurer, or anything else, and he ought in return to get immunity from damage suits." *Id.* at 14-187.

Similarly, the temporary employer ought to get immunity from employee damage suits on the theory that the temporary employer is primarily liable for the employee's worker's compensation, is contingently liable for such compensation, or shares in the cost of providing such compensation.

Because Gansch was an employee of a "temporary help agency," as defined in sec. 102.01(2)(f), Stats., and he made a claim for worker's compensation benefits, sec. 102.29(6) prevents him from maintaining this action in tort against Nekoosa Papers. I therefore respectfully dissent.